## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Sancilio Pharmaceuticals Company, Inc., *et al.*,[1] | Case No. 18-11333 (CSS) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF GEOFFREY GLASS IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF

I, **GEOFFREY GLASS**, hereby declare, under penalty of perjury, as follows:

1.      I am the President and Chief Executive Officer of Sancilio Pharmaceuticals Company, Inc. ("**SCP**"), Sancilio & Company, Inc. ("**SCI**") and Blue Palm Advertising Agency, LLC ("**Blue Palm**"; collectively with SCP and SCI, "**Sancilio**" or the "**Debtors**").  I am also a member of the Board of Directors of SCP.  I perform my duties from the Debtors' corporate offices located at 2129 N. Congress Avenue, Riviera Beach, FL 33404.

2.      I have more than twenty years of experience in life sciences and pharmaceuticals industry.  Before joining Sancilio, I served in senior executive roles at Valeant Pharmaceuticals, Patheon Pharmaceuticals, and Banner Life Sciences.  I have also worked as a consultant in the life sciences industry at Ernst & Young, Cap Gemini and Clear Sciences.  In addition, I have served on the Board of Directors of Locus Biosciences, a leading biotech company utilizing CRISPR technologies for precision medicines.  As a result of this extensive background, I have deep experience in the business, financial and other aspects of the life sciences and pharmaceuticals industry.

---

[1]  The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are:  Sancilio Pharmaceuticals Company, Inc., 2129 N. Congress Avenue, Riviera Beach, FL 33404 (3353); Sancilio & Company, Inc., 2129 N. Congress Avenue, Riviera Beach, FL 33404 (7166); Blue Palm Advertising Agency, LLC, 2129 N. Congress Avenue, Riviera Beach, FL 33404 (n/a).

3.      I joined Sancilio's Board of Directors in December 2017 and became its President and CEO in January 2018.  In these capacities, I have become familiar with the Debtors' day-to-day operations, business and financial affairs.

4.      I submit this declaration (the "**Declaration**") to assist the Court, as well as creditors and other parties in interest, in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "**Chapter 11 Cases**") and also in support of:  (a) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtors have requested from the Court in the form of various motions and applications filed on or about the Petition Date and described herein (collectively, the "**First Day Motions**").

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      Part I of this Declaration provides an introduction of the Debtors and these Chapter 11 Cases.  Part II of this Declaration describes in more detail the Debtors' corporate structure, business, prepetition capital structure, the developments that led to the Debtors' chapter 11 filings, and the Debtors' goals in these Chapter 11 Cases.  Part III describes the Debtors' request for authority to enter into the DIP Facility (as defined below) and the facts in support thereof.  Part IV sets forth the relief requested by the various First Day Motions and the facts supporting such relief.

# I.
## Introduction

7.    Sancilio is a private pharmaceutical development and manufacturing company. Its business is comprised of multiple business lines including: (i) the development of proprietary prescription medicines using a unique and proprietary solubility enhancement technology called Advanced Lipid Technologies ("**ALT**"), including Sancilio's lead product candidate under the ALT platform for the treatment of sickle cell disease in the pediatric population; (ii) over-the-counter and behind-the-counter omega-3 dietary supplements under the brand "Ocean Blue"; (iii) prenatal vitamins and dental health supplements that operate as "generics" dispensed at pharmacies; and (iv) third-party development and manufacturing services for other companies.

8.    In 2017, Sancilio began experiencing increasingly constrained access to additional capital and liquidity and, by late 2017, endured a liquidity crisis. In early 2018, Sancilio secured an additional $5.5 million in equity capital to serve as bridge financing to pay overdue trade payables pending an expected sale of the company, but that transaction was not consummated. Accordingly, Sancilio began exploring its strategic alternatives including a further recapitalization, refinancing or sale. Notwithstanding these efforts, Sancilio received no executable offer for recapitalization or refinancing.

9.    Since mid-April the Debtors' liquidity needs have been met from protective overadvances funded by the Prepetition Lenders (as defined below). Having no executable path to a recapitalization or refinancing, the Debtors' commenced these cases to preserve themselves as a going concern and to maximize the value of their estates. The Debtors' objectives in these Chapter 11 Cases are to sell all or substantially all their assets pursuant to section 363 of the Bankruptcy Code in a flexible manner allowing for bids on all their assets, one or more of their business lines, or any combination thereof.

## II.
## Background

A.    **The Debtors' Corporate Structure**

10.    Sancilio is a privately held company.  A chart depicting its corporate structure is attached as **Exhibit A** hereto.

11.    SCP is a corporation organized under the laws of the State of Delaware.  It is a holding company with no assets other than the equity of SCI and no liabilities other than the Prepetition Secured Loans (as defined below).

12.    SCI is a corporation organized under the laws of the State of Delaware.  It is a wholly-owned subsidiary of SCP.  It is the Debtors' operating entity.  In addition to other assets, liabilities and operations more fully set forth below, SCI has three wholly-owned subsidiaries: (i) Blue Palm, (ii) Sancilio Medical Technology (Shanghai) Co., Ltd ("**Sancilio China**"); and (iii) Sancilio Pharmaceuticals Private Limited ("**Sancilio India**"; together with Sancilio China, the "**Non-US Entities**").

13.    Blue Palm is a limited liability company formed under the laws of the State of Florida.  It is a wholly-owned subsidiary of SCI.  Blue Palm has no assets, employees or operations, and no liabilities other than the Prepetition Secured Loans (as defined below).

14.    Sancilio China is a limited liability company formed under the laws of the People's Republic of China.  Sancilio China is not a debtor in these Chapter 11 Cases.  As of the Petition Date, Sancilio China has *de minimis* assets and liabilities.

15.    Sancilio India is a private limited company formed under the laws of the Republic of India.  Sancilio India is not a debtor in these Chapter 11 Cases.  As of the Petition Date, Sancilio India has two employees and *de minimis* assets and liabilities.

16.    The Debtors intend to wind down any remaining business and operations of the Non-US Entities and to dissolve them under local law.[2]

**B.    The Debtors' Business**

*i.    The ALT Platform*

17.    The ALT platform refers to several unique drug delivery systems and manufacturing techniques under patent or trade secret protection for the creation of drug products that address the challenges associated with efficient absorption of lipid-based or lipophilic active pharmaceutical ingredients ("**APIs**") by the body.

18.    Lipids are hydrophobic or amphipathic molecules, such as fatty acids (including omega-3 fatty acids and omega-6 fatty acids), steroids (including hormones) and fat-soluble vitamins (including vitamins A, D, E and K).  Lipids do not dissolve well in water, and instead are absorbed better by the body when taken with fats.  The body's natural process to metabolize lipids is inefficient and relies upon fats obtained from food or bile salts generated by the body in response to eating.  This biology leads to the "food effect"—the need to administer a lipid-based or lipophilic drug product with food and the consequent inconsistency of bioavailability and efficacy caused by varying levels of food and patient compliance.  Thus, bioavailability and efficacy of lipid-based or lipophilic APIs is often limited.

19.    Many promising APIs are lipid-based or lipophilic.  Development of drug products based on such APIs therefore faces a dilemma.  Either the API is developed into a drug product using its native lipid form or it is converted to a non-native hydrophilic (water soluble) form.  If the native form is used, then the product is likely to suffer the "food effect."  If the non-native form is used, then other challenges typically arise resulting from suboptimal performance of the non-

---

[2] To the extent required by the Bankruptcy Code, the Debtors will seek authority from the Court to take any necessary or appropriate corporate action that may be required to wind-down and dissolve the Non-US Entities.

native form for from the "first pass effect"—the processing of hydrophilic compounds in the liver before they reach the intended treatment site in the body.

20.     Drug products developed under the ALT platform avoid this dilemma.  Such drug products are designed to improve the body's ability to absorb and metabolize efficiently lipid-based or lipophilic APIs in the absence of food.  The benefits of drug products designed under the ALT platform relative to traditional methods for developing lipid-based or lipophilic APIs include enhanced consistency and predictability of efficacy and results, reduced dosing (potentially 50% less than drug products developed using traditional methods), and smaller, easier to swallow capsules.

### ii.     *Proprietary Drug Products*

21.     Using the ALT platform, Sancilio has focused on creating a line of proprietary drug products candidates that, if regulatory approval is obtained, would target disorders and diseases that may be correctable by restoring the body's natural lipid balance (the "**Proprietary Drug Products Line**").

22.     Foremost among these candidates is Altemia, which is being developed for treatment of sickle cell disease for pediatric patients.  Altemia is encapsulated in a soft gelatin capsule and intended to be taken orally.  Altemia has garnered Orphan Drug status from FDA (US regulatory agency) and EMA (European regulatory agency) and is poised to enter a Phase III pivotal clinical study for the next step of development.

23.     Beyond Altemia, Sancilio has a deep ALT-based pipeline of other proprietary drug products candidates in preclinical or early exploratory stages.  These include SC401, which targets severe hypertriglyceridemia; SC403, which targets short bowel syndrome; SC410, which targets non-alcoholic fatty liver disease; SC412, which targets retinitis pigmentosa and macular degeneration; and SC413, which targets epilepsy.

### iii.    *Dietary Supplements*

24.    Sancilio also manufactures and markets two lines of dietary supplements.

25.    The first line is the Ocean Blue brand of over-the-counter and behind-the-counter supplements of highly concentrated omega-3 fatty-acid fish oil (the "**Ocean Blue Line**"), which are intended to help support cardiovascular and metabolic health. The Ocean Blue supplements are characterized by increased bioavailability of desirable fatty acids due to the purity of the component fish oil. They have also been clinically shown to maintain health triglyceride levels. The behind-the-counter supplements in the Ocean Blue Line are available from pharmacies within national and regional retail stores, and the over-the-counter supplements are nationally distributed and available at retail directly to consumers.

26.    The second line is comprised of prescription prenatal vitamins and dental health supplements (the "**Prenatal and Dental Health Supplements Line**"; together with the Proprietary Drug Products Line and the Ocean Blue Line, the "**Business Lines**"). The prenatal vitamins provide vitamin and nutritional supplementation throughout pregnancy and during the postnatal period for both the lactating and non-lactating mother. These products contain no artificial color, flavors, sugars, or dyes, and are gluten and saccharin free. The dental health supplements are fluoride-based and are intended to be used as a substitute for fluoridated water for individuals living in areas where drinking water is non-fluoridated. Many Prenatal and Dental Health Supplements receive a prescription, and are dispensed by a pharmacist. Sancilio sells these product through drug wholesalers, and directly to retail pharmacies.

### iv.    *Third Party Services*

27.    Sancilio offers a comprehensive range of development and manufacturing services to third party pharmaceutical companies at its facilities (the "**Third Party Services Line**"). These services are offered in connection with a license to the ALT platform or without it if ALT is not

required for the product and service. Sancilio assists these third-party customers with all phases of development from concept to market, and its services generally are provided on a fee-for-service basis. Sancilio negotiates to become the registered manufacturer for the projects for which its offers development services. The customers for these services range in size, and are focused on the commercialization of branded and generic pharmaceutical products.

## C.    The Debtors' Prepetition Capital Structure

### i.    *Prepetition Secured Loans*

28.    Before the Petition Date, the Debtors and MidCap Financial Trust, as agent (in such capacity, the "**Prepetition Agent**") for the Lenders thereunder and the financial institutions or other entities from time to time party thereto as Lenders (collectively, the "**Prepetition Lenders**," and together with the Prepetition Agent, the "**Prepetition Secured Parties**") entered into that certain (i) Credit and Security Agreement, dated as of February 1, 2016 (as amended by that certain First Amendment to Credit and Security Agreement and Limited Waiver, dated as of April 13, 2017; (ii) Second Amendment to Credit and Security Agreement and Limited Waiver, dated as of October 23, 2017; (iii) Third Amendment to Credit and Security Agreement, dated as of January 2, 2018; and (iv) Omnibus Fourth Amendment to Credit and Security Agreement and First Amendment to Third Amendment to Credit and Security Agreement, dated as of January 8, 2018, the "**Prepetition Loan Agreement**").

29.    After entry into the Prepetition Loan Agreement but before the Petition Date, the Prepetition Agent declared a default pursuant to that certain Notice of Default and Reservation of Rights Letter, dated April 6, 2018, delivered to SCP. Thereafter, the Debtors and the Prepetition Secured Parties entered into that certain (i) Protective Advance Letter, dated April 12, 2018; (ii) Second Protective Advance Letter, dated April 26, 2018; (iii) Third Protective Advance letter, dated May 3, 2018; (iv) Fourth Protective Advance Letter, dated May 10, 2018; (v) Fifth Protective

Advance Letter, dated May 17, 2018 (the foregoing Protective Advance Letters and the Prepetition Loan Agreement, and together with will all other agreements, documents and instruments, entered into or delivered in connection with the foregoing, collectively, the "**Prepetition Loan Documents**"), pursuant to which, among other things, the Prepetition Lenders made certain loans and other financial accommodations to the Debtors in aggregate principal amount of not less than $18,114,500 (collectively, the "**Prepetition Secured Loans**").

30.    The Prepetition Secured Loans are secured by first-priority, fully-perfected security interests in and liens on all of Debtors' right, title and interest in, to and under the "Collateral" as defined in the Prepetition Loan Documents (the "**Prepetition Collateral**").

*ii.    Unsecured Claims*

31.    As of the Petition Date, the Debtors have unsecured obligations, not including any deficiency claims, in the approximate amount of $5,008,299.72, consisting of accounts payable to various trade creditors.

*iii.    Preferred and Common Stock*

32.    Before the Petition Date, SCP funded the Debtors' operations, working capital needs and investments, *inter alia*, through the issuance of redeemable convertible preferred stock. As of the Petition Date, there are five series of preferred stock outstanding.

33.    As of the Petition Date, the common stock of SCP is privately held.

34.    Certain of the holders of SCP's preferred stock and common stock have entered into the Fourth Amended and Restated Stockholders' Agreement, dated as of January 9, 2018,

**D.    Events Leading up to these Chapter 11 Cases**

35.    Sancilio depends on its ability to develop successfully, obtain regulatory approval for, and commercialize the product candidates in its Proprietary Drug Products Line.  These activities require substantial working and investment capital before generating a return, and

involve clinical trials that often inject delays, additional expense and uncertainty. Additionally, Sancilio depends upon the performance of its other business lines including: the Ocean Blue Line, the Prenatal And Dental Health Supplements Line and the Third Party Services Line. The pricing and demand of all these business lines is highly variable and outside the company's control. As described above, before the Petition Date, SCP funded these capital needs by, among other things, obtaining the Prepetition Secured Loan and issuing preferred stock.

36.    In 2017, Sancilio experienced increasingly constrained access to additional capital and liquidity. Among other challenges, the Prepetition Agent declared a default on April 13, 2017 for Sancilio's failure to apply the cash proceeds of an asset sale in accordance with the Prepetition Loan Agreement and a default on October 23, 2017 for Sancilio's failure to generate Net Revenue adequate to satisfy the Minimum Net Revenue Threshold (each term as defined in the Prepetition Loan Agreement). The Prepetition Secured Parties agreed to waive these defaults in exchange for the terms and conditions set forth in the First Amendment to Credit and Security Agreement and Limited Waiver and the Second Amendment to Credit and Security Agreement and Limited Waiver.

37.    Notwithstanding these waivers, by the end of 2017, Sancilio encountered a liquidity crisis. Sancilio was able to raise an addition $5 million in equity capital via issuance of the Series E Preferred Stock in January 2018. This cash infusion was intended as bridge financing to permit payment of overdue trade payables pending an anticipated sale of Sancilio. This sale was not consummated.

38.    In light of these events, Sancilio began exploring its strategic options, including raising new capital investment, a refinancing of the Prepetition Secured Loans or one or more asset sales. In July 2017, Sancilio retained RBC Capital Markets as its investment banker to assist with

one or more potential strategic transactions. Sancilio also discussed the possibility of a restructuring of the Prepetition Loans with the Prepetition Secured Parties. In addition, Sancilio approached its existing preferred stockholders concerning the potential for additional capital investment. However, Sancilio has found no meaningful interest in a recapitalization, refinancing, restructuring or other strategic transaction.

39.    On April 8, 2018, the Prepetition Agent declared a default for the Debtors' failure to meet the Minimum Net Revenue (as defined in the Prepetition Loan Agreement) requirement and for the occurrence of a Material Adverse Change (as defined in the Prepetition Loan Agreement). Subsequently, the Prepetition Agent declared a further default for the Debtors' failure to make an Interest Payment (as defined in the Prepetition Loan Agreement) due on May 1, 2018.

40.    Since mid-April 2018, Sancilio has relied upon protective overadvances by the Prepetition Lenders in order to meet the Debtors' ordinary course expenses. Sancilio's request for protective overadvances are subject to weekly approval from the Prepetition Secured Parties. There is no contractual obligation for continued funding of Sancilio's overadvance requests. Without protective overadvances from Prepetition Lenders or another source of financing, the Company will face an immediate liquidity crisis and have no alternative other than winding down its operational and financial affairs.

41.    The Prepetition Lenders have firmly stated that they will no longer fund additional protective overadvances outside the protections of Chapter 11 commenced to effectuate a sale of all or substantially all of Sancilio's assets. The Prepetition Lenders have also firmly stated that they will cause the commencement of a foreclosure action if such a chapter 11 case does not occur.

42.    In light of the absence of opportunities for refinancing the Prepetition Secured Loans, and recapitalization, restructuring or other strategic alternatives other than an asset sale

under the aegis of Chapter 11, the Debtors commenced these Chapter 11 Cases to preserve themselves as a going concern and to maximize value for the benefit of their estates and creditors.

## E.    Objectives for these Chapter 11 Cases

43.    The Debtors intend to sell all or substantially all their assets pursuant to section 363 of the Bankruptcy Code.  As set forth below, the Debtors contemplate a flexible section 363 process pursuant to which potential bidders may bid on all of the Debtors' assets, one or more specific Business Lines or other combinations.  The Debtors have obtained two separate stalking horse bids for the Proprietary Drug Products Line and the Prenatal and Dental Health Supplements, on the one hand, and for the Ocean Blue Line, on the other.

44.    Based upon the prepetition expressions of interest for the Debtors' assets, the Debtors believe it unlikely that the proceeds from the sale of their assets will be sufficient to pay a meaningful dividend, if any, to creditors other than the Prepetition Lenders.  After their assets sales are consummated, the Debtors intend to wind down and liquidate any remaining operations and assets as may be necessary and appropriate.

### III.
### The DIP Facility

45.    As part of the First Day Motions, the Debtors are filing the *Motion for the Entry of Interim and Final Orders (I) Approving Debtor-In-Possession Financing Pursuant to 11 U.S.C. §§ 105(A), 362, and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 of the Bankruptcy Code; (III) Granting Adequate Protection and Super-Priority Administrative Claims; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Motion**"). Among other things, the DIP Motion requests authority for the Debtors, on the terms and conditions set forth in that certain Debtor in Possession Credit and Security Agreement, dated as

of June 5, 2018 (the "**DIP Loan Agreement**"), to incur post-petition indebtedness (the "**DIP Facility**"), which includes post-petition financing in the aggregate principal amount of not more than $5,300,000, a $265,000 Origination Fee, and a five percent Termination Fee, from MidCap Funding XVIII Trust, as the DIP Agent (in such capacity, the "**DIP Agent**"), and MidCap Funding XVIII Trust and each of the other lenders from time to time party thereto (collectively, the "**DIP Lenders**"), and to use Cash Collateral (as defined in the DIP Loan Agreement) of the Prepetition Secured Parties. I understand that the DIP Agent and DIP Lenders are affiliates of the Prepetition Secured Parties.

46.     The terms and conditions of the DIP Facility require, among other things, that the Debtors conduct a sale of all or substantially all its assets pursuant to section 363 of the Bankruptcy Code (the "**Section 363 Sale**") in accordance with certain milestones. To maximize the value of its estate, and in compliance with the milestones under the proposed DIP Facility, the Debtors are filing a motion to conduct the Section 363 Sale (the "**Sale Motion**"), including a marketing and auction process, by which the Debtors will solicit offers and ultimately seek approval to sell substantially all of its assets to the bidder or bidders with the highest or otherwise best offer. As more fully set forth in the Sale Motion, the Debtors have selected two stalking horse bidders for separate portions of the Debtors' assets. The Debtors are also filing an application to retain an investment banker to advise and assist the Debtors in conducting the Section 363 Sale.

47.     In my role as President and Chief Executive Officer of the Debtors, I was actively involved in the negotiations leading up entry into the DIP Facility lenders. The negotiations were conducted at arm's length and in good faith. As more fully set forth below, I believe the economics and the terms and conditions of the DIP Facility are standard and reasonable for financing of this kind. Based on the negotiations that took place, I believe that these are the only terms on which

the DIP Lenders will provide the financing. As the DIP Facility proceeds are necessary and the best financing available at this time, I believe that sufficient justification exists for agreeing to these provisions. Moreover, it is my understanding that the DIP Lenders would not have provided financing without the bargained-for protections contained in the DIP Loan Agreement.

**A.     Necessity for the DIP Facility and Use of Cash Collateral and the Debtors' Immediate Need for Liquidity**

48.     Since mid-April 2018, the Debtors have relied upon protective overadvances from the Prepetition Lenders to continue operations and preserve value.  Had the Debtors relied solely on revenues from operations without these protective overadvances, significant business disruptions would almost certainly have resulted.  As projected in the Budget (as defined in theDIP Loan Agreement), it remains the case after the Petition Date that projected revenues are likely to be insufficient to fund adequately the Debtors' operations and working capital needs and the additional cash flow required to fund the administrative expenses of these Chapter 11 Cases. Absent both approval of the DIP Facility and authorization to use Cash Collateral, I believe the Debtors will almost certainly experience business disruptions.  Moreover, the I believe that approved and demonstrated access to liquidity through the DIP Facility and use of Cash Collateral is essential to provide the Debtors' employees, vendors and service providers, and other stakeholders confidence in the Debtors' ability to continue operating while it pursues the Section 363 Sale.

49.     Accordingly, the Debtors have an immediate and compelling need for access to both the DIP Facility and Cash Collateral.  Among other things, this access is necessary to among other things, continue the operation of its business in an orderly manner, maintain business relationships with customers and vendors, pay employees and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtor's going-

concern value and, ultimately, conduct successfully a Section 363 Sale. Based on these circumstances, the Debtors require the funding provided by the proposed DIP Facility and use of Cash Collateral to avoid immediate and irreparable harm to its operations, business and estate.

**B.      Unavailability of Alternative Financing on Unsecured or Other Basis**

50.      I believe that financing in an amount necessary to fund these Chapter 11 Cases is not obtainable on an unsecured, *pari passu* or junior secured basis. I understand that no potential third-party source of financing for the Debtors, available on an expedited basis and on reasonable terms, would agree to provide unsecured or junior secured financing in such amount in light of the secured position of the Prepetition Secured Parties. It is my belief that, any such potential source of financing, on secured terms, would require liens that prime those of the Prepetition Secured Parties. The Prepetition Secured Parties have stated they do not consent to priming and would object to any such request. A contested priming or adequate protection fight would like prove devastating to the Debtors' business and to the contemplated Section 363 Sale, subjecting the Debtors to a significant risk of being unfinanced or underfinanced for an extended period of time, especially in light of the Debtors' liquidity position as of the Petition Date.

**C.      Reasonableness of Terms and Conditions of DIP Facility**

51.      I believe that the terms of the DIP Facility are fair, reasonable and adequate, in light of the circumstances of the Debtors and the DIP Lenders, and that the DIP Facility is the only viable source of financing for these cases. Accordingly, on behalf of the Debtors, with the assistance of their advisors, I negotiated with the DIP Lenders at arm's length and in good faith to obtain from them the best terms available. I am confident that the DIP Facility so obtained is sized to meet the reasonably anticipated operational costs and administrative expenses during the expected pendency of these Chapter 11 Cases as reflected in the Budget. The economics, of the DIP Facility, including the interest rate and fees, reflect a fair, market exchange for the financing

made available to the Debtors.  Similarly, the terms and conditions of the DIP Facility, including the case milestones, consensual priming DIP Liens, and certain other stipulations, waivers and case management features, are reasonable in light of the Debtors' and the objectives of these Chapter 11 Cases.  I understand that these economics, and terms and conditions, are also within the range of typical DIP facilities in the marketplace for chapter 11 debtors in similar business, and with similar size and finances, of the Debtors.

### D.    Reasonableness of the Adequate Protection

52.    I believe that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate.  As set forth in the Interim DIP Order and other DIP Loan Documents, the Debtors propose to provide the Prepetition Secured Parties with Adequate Protection, including the Adequate Protection Liens, the Adequate Protection Super-priority Claims, and current cash payments to the Prepetition Secure Parties payable under the Prepetition Loan Documents for all professional fees and expenses in connection with the enforcement of the Prepetition Loan Documents and the Chapter 11 Cases.  Subject to the terms and conditions of the Interim DIP Order, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in exchange for the Adequate Protection.

53.    Use of Cash Collateral in accordance with the terms of the Budget preserves and maximizes the value of the Prepetition Collateral.  Under the Budget, Cash Collateral will be used to pay operating expenses, and payroll for the Debtors' employees.  In addition, the Budget provides for the expenses of administration of these Chapter 11 Cases, including to fund the Section 363 Sale.  I believe payment of these and other expenses in accordance with the terms of the Budget is necessary to maintain the Debtors' enterprise as a going concern and thereby to maximizing the value of the Debtors' estates.

## IV.
## The First Day Pleadings

54.    As noted above, concurrently with and shortly after the filing of these Chapter 11

Cases, the Debtors are or will be filing First Day Motions requesting relief necessary or appropriate

to effectuate the Debtors entry into and continued operations under Chapter 11.  The Debtors

anticipate that the Court will conduct a hearing within a business day or two after the

commencement of the Chapter 11 Cases during which the Court will consider the First Day

Motions.

55.    Generally, the First Day Motions have been designed to meet the immediate goals

of (i) establishing procedures for the efficient administration of these Chapter 11 Cases;

(ii) continuing the Debtors' operations during these Chapter 11 Cases with as little disruption and

loss of productivity as possible; and (iii) maintaining the confidence and support of the Debtors'

key constituencies.  I have reviewed each of the First Day Motions, including the exhibits, attached

thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to

meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve

success in these Chapter 11 Cases.

56.    A summary of the relief requested and the facts support each of the First Day

Motions follows.[3]

**A.    Motion for Entry of an Order Directing Joint Administrative of Related Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b).**

57.    Because SCI and Blue Palm are direct and indirect subsidiaries of SCP, such that

the Debtors constitute "affiliates" of one another within the meaning of section 101(2) of the

---

[3] Capitalized terms used in Part IV but not otherwise defined in this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

Bankruptcy Code, the Debtors request that the Court maintain one file and one docket for the Chapter 11 Cases under the SCP case and also request that the caption of each of the Chapter 11 Cases be modified to reflect the joint administration of the Chapter 11 Cases. Additionally, the Debtors request that the Court authorize the Debtors to use a combined service list for the jointly administered Chapter 11 Cases for purposes of noticing creditors of the Debtors' estates.

58.     Joint administration will permit the Clerk to use a single general docket for the Debtors' Chapter 11 Cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates, which will protect parties in interest by ensuring that such parties will be apprised of the various matters before the Court in each of the Chapter 11 Cases. Additionally, not only will joint administration of the Debtors' Chapter 11 Cases reduce fees and costs resulting from the administration of these Chapter 11 Cases and ease the onerous administrative burden of having to file multiple documents, but it will also ease the administrative burden for the Court and all parties to the Chapter 11 Cases as well as obviate the need for duplicative notices, motions, applications and orders, thereby saving the Debtors and their estates time and money.

**B.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to File (I) A Consolidated Master List of Creditors and (II) A Consolidated List of the Debtors' Twenty Largest General Unsecured Creditors.**

59.     The Debtors seek authority to file (i) a consolidated list of the Debtors' creditors and (ii) a consolidated list of the Debtors' twenty (20) largest general unsecured creditors, exclusive of insiders. Local Rule 1007-2 provides that the Debtors are obligated to file, with their petitions, a list containing the name and address of each of their respective creditors. Additionally, Local Rule 2002-1(f)(v) requires each debtor in jointly administered cases to maintain a separate creditor mailing matrix. However, Local Rule 1001-1(c) permits modification of the Local Rules by the Court "in the interests of justice."

60.     The Debtors maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in these Chapter 11 Cases.  The Debtors believe these lists may be consolidated and utilized efficiently to provide interested parties with notices and other similar documents, as contemplated by Local Rule 1007-2.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and could result in duplicate mailings.  The Debtors submit that permitting them to file a consolidated list of creditors, rather than filing a separate creditor matrix for each Debtor, is warranted.

61.     Additionally, Bankruptcy Rule 1007(d) requires a chapter 11 debtor to file, with its petition, a list identifying the names, addresses, type and claim amounts of creditors, exclusive of insiders, with the twenty (20) largest unsecured claims in the debtor's case.  The Debtors believe that a single, consolidated list of their combined twenty (20) largest general unsecured creditors in these Chapter 11 Cases would be more reflective of the body of unsecured creditors that have the greatest stake in these Chapter 11 Cases.

**C.     Motion of the Debtors for Entry of an Order Authorizing (I) the Debtors to Pay Prepetition Property Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto.**

62.     In connection with the normal operations of their businesses, the Debtors pay property taxes to certain state and local taxing authorities and regulatory fees to certain federal and state regulatory authorities.  Specifically, the Debtors incur real and personal property taxes and franchise taxes in jurisdictions in which they operate in the ordinary course of business.  Failure to pay the Taxes can result in the attachment of statutory liens on property that is critical to the Debtors' operations.  Additionally, the failure to pay the Taxes may result in the imposition of

penalties and interest or prohibit the Debtors from operating in certain jurisdictions. The Debtors estimate that they owe approximately $64,000 of Taxes as of the Petition Date.

63.    Among other things, the Debtors manufacture and supply health supplements and pharmaceutical drugs in the United States. As such, the Debtors are required to obtain various state and federal permits and licenses to operate their businesses as a drug manufacturer, distributor, and research facility. The majority of the Regulatory Fees the Debtors incur consists of the registration and/or renewal fees associated with such licenses and permits. Because of the number of licenses and permits the Debtors must maintain as well as the variety and frequency of their respective renewal periods, the Debtors enlist the assistance of the Corporation Service Company to keep track of and renew, when necessary, the Debtors' permits and licenses. The Debtors estimate that approximately $7,200 of Regulatory Fees are outstanding as of the Petition Date.

64.    By the motion, the Debtors seek authority to pay prepetition Taxes and Fees owed to the Taxing and Regulatory Authorities, provided that the aggregate amount of such payments shall not exceed $85,000. In addition, the Debtors also seek authorization to honor (i) all checks that remain uncashed prior to the Petition Date or that are otherwise returned by a Taxing or Regulatory Authority as well as (ii) those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

65.    There are a number of bases for granting the relief requested in this motion, including: (i) governmental entities might sue the Debtors' directors and officers for certain unpaid Taxes and Fees, distracting them unnecessarily from the Debtors' efforts in these chapter 11 cases; (ii) portions of the Taxes and Fees may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code; (iii) section 363 of the Bankruptcy Code gives the Debtors

authority to remit payment on account of such Taxes and Fees in the ordinary course of business and (iv) section 105 of the Bankruptcy Code and the Court's general equitable powers permit the Court to grant the relief sought. Furthermore, nonpayment of these obligations may cause Taxing and Regulatory Authorities to take precipitous action, which could include filing liens, preventing the Debtors from conducting business in applicable jurisdictions and seeking to lift the automatic stay, all of which could disrupt the Debtors' day-to-day operations and impose significant costs on the Debtors' estates and destroy the going concern value of the Debtors' business.

**D. Motion of the Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Providers Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Adequate Assurance of Payment.**

66. In connection with the operation of their businesses and management of their estates, the Debtors obtain electricity, gas, water, sewer, internet, telephone, and other similar services from a number of utility companies. The Debtors' aggregate average monthly cost for the Utility Services is approximately $33,125.

67. The Debtors intend to pay all postpetition obligations and expect that revenues generated from their business operations and/or funds from their DIP financing facility and/or cash collateral will be sufficient to pay all undisputed postpetition obligations owed to the Utility Providers in a timely manner. To provide adequate assurance of payment for future services to the Utility Providers the Debtors propose to deposit an initial sum equal to the Debtors' estimated average cost for two (2) weeks of Utility Services into a segregated account, except for that of Utility Providers holding deposits in excess of such amount. Because the Debtors' average monthly spending on Utility Services is approximately $33,125 and one Utility Provider holds a deposit greater than the value of two (2) weeks' worth of the Utility Service it provides, the Debtors propose that the Adequate Assurance Deposit should be approximately $6,562.50.

68.    Any interruption of the Utility Services would disrupt the Debtors' ability to operate and maintain their businesses and would thereby negatively affect the Debtors' customer relationships, revenues and profits.  Such a result could seriously jeopardize the Debtors' anticipated sale process and, ultimately, their value and constituent recoveries.

69.    By the motion, the Debtors request a determination that their Utility Providers have been provided with adequate assurance of future payment and that the Debtors are not required to provide any additional adequate assurance.  Additionally, the Debtors request the Court approve the Debtors' proposed adequate assurance procedures.  Lastly, the Debtors request the Court prohibit the Utility Providers from altering, refusing or discontinuing the provision of Utility Services due to outstanding prepetition amounts.

**E.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Maintain Existing Insurance Policies, Pay All Policy Premiums Arising Thereunder and Renew or Enter Into New Policies, and (B) Continue Insurance Premium Financing Program, Pay Insurance Premium Financing Obligations Arising in Connection Therewith and Renew or Enter into New Premium Financing Arrangements.**

70.    In the ordinary course of business, the Debtors maintain numerous insurance policies with various insurance companies providing coverage for, *inter alia,* general liability, excess liability, automobiles, property, and workers' compensation. The Policies are essential to continue to operate the Debtors' business as the U.S. Trustee Operating Guidelines require the Debtors to maintain certain insurance coverage through the pendency of their Chapter 11 Cases.

71.    The Debtors finance the premiums on three (3) of the Policies pursuant to a premium financing agreement with FIRST Insurance Funding Corp.  Pursuant to the PFA, the Debtors' obligations to First Insurance are collateralized by security interests in the Policies financed through the PFA.  Therefore, if the Debtors are unable to make payments under the PFA, First Insurance may be permitted to terminate certain of the Policies to recoup losses.  Furthermore,

if the Debtors cease making payments on the Policies, the Debtors may be required to obtain replacement insurance on an expedited basis and at great cost to their estates.

72.    The Debtors believe that nominal prepetition amounts are due and owing to the Insurance Companies and will come due in the days following the Petition Date.  By the motion, the Debtors request authorization to pay all premiums arising under the Policies, whether prepetition or postpetition, and renew or enter into new policies as needed and to continue insurance premium financing under the Debtors' premium financing agreement, pay insurance premium financing obligations arising thereunder or in connection therewith and renew or enter into new premium financing agreements as needed when the existing arrangement expires, without further order of the Court.

**F.    Motion of Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Claims of Materialmen in the Ordinary Course of Business.**

73.    As part of their business operations, the Debtors rely on a variety of Materialmen to provide packaging and labelling services and materials for certain of the Debtors' manufactured products.  The Debtors seek authority pay certain Materialmen to the extent necessary to satisfy non-disputed prepetition Lien Claims and to satisfy any potential, asserted, or actual possessory liens, if any, on the goods that may be held by any Materialmen pending the payment of such charges.  Such payments are not expected to exceed approximately $22,000.

74.    The Debtors will only pay Lien Claims where they believe, in their business judgment, benefits to their estates and creditors from making such payments would exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods, and (b) the delays associated with such actions.  The Debtors also request entry of an order authorizing banks and other financial institutions to rely on the Debtors' direction to pay amounts authorized under the motion, provided there are sufficient funds available in the Debtors accounts.

75.    It is vital for the Chapter 11 Cases that the Debtors retrieve their goods held by Materialmen on account of prepetition claims for value-added services provided by such Materialmen, I believe the Court should grant this request, and authorize the Debtors to pay certain Materialmen in full and final satisfaction of claims giving rise to potential Liens on the Debtors' property.

**G.    Motion of the Debtors for Entry of an Order (I) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (II) Authorizing the Continued Use of Existing Cash Management System, (III) Waiving Certain Investment and Deposit Guidelines, and (IV) Granting Related Relief.**

76.    Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of business, the Debtors maintained 5 Bank Accounts. The Debtors' cash management system is maintained at JP Morgan Chase. A summary of the Debtors' Cash Management System follows:

(a) <u>Operating Account</u>: The Debtors maintain an Operating Account for day-to-day operations, which receives non-credit card receipts directly and credit card receipts transferred from the Merchant Account. Funds are transferred from the Operating Account to the Payroll Account and Disbursement Account for disbursements to vendors and employees.

(b) <u>Disbursement Account</u>: The Disbursement Account is a zero balance account; funds are automatically transferred from the Operating Account to the Disbursement Account as needed for payments on all non-payroll expenses of the Debtors, including, but not limited to, inventory purchases, utilities, insurance premiums, and certain employee benefit premiums.

(c) <u>Merchant Account</u>: The Merchant Account is also a zero balance account that receives credit card payments from customers. These funds are automatically transferred to the Operating Account the evening of deposit.

(d) <u>Payroll Account</u>: The Debtors maintain a just-in-time Payroll Account that is also a zero balance account. The Payroll Account is used to pay employee salaries and commissions, payroll taxes, wage garnishments and certain employee benefits when the Debtors' payroll processor, ADP debits the Payroll Account for the Debtors' bi-weekly payroll. Funds are automatically transferred into the Payroll Account from the Operating Account every other Thursday prior to the Debtors' payroll and as needed to cover certain employee benefit payments.

(e) <u>Money Market Account</u>:  The Money Market Account, similar to a generic savings account, yields monthly interest income, though the funds in the Money Market Account are more restricted than those in their other accounts.

77.     The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of the Chapter 11 Cases with the same account numbers and, where applicable, automated relationship.  The Debtors also seek authority to deposit funds in and withdraw funds from all such accounts postpetition, including, but not limited to, checks, wire transfers, ACH, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

78.     The Debtors also use pre-printed check stock with the relevant Debtor's name printed thereon and maintain pre-printed correspondence and business forms such as letterhead, envelopes and promotional materials.  The Debtors will be able to minimize administrative expense and delay if they continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

**H.      Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay (I) All Prepetition Employee Obligations and (II) Prepetition Withholding Obligations, and (B) Directing Banks to Honor Related Transfers.**

79.     In order to enable the Debtors to maintain morale during this critical time, retain their current Employees and Independent Contractors and minimize the personal hardship such Employees and Independent Contractors may suffer if prepetition employee-related obligations are not paid when due or honored as expected, the Debtors seek authority, in their sole discretion,

to pay and honor, as the case may be, the Employee Obligations, the Reimbursable Expenses, and any prepetition claims for Independent Contractors, up to the Statutory Cap.

80.    The Debtors primarily operate in Florida.  Neither SCP nor Blue Palm have current operations or employees.  SCI's workforce is comprised of approximately 97 employees, the majority of the which work full-time.  In addition, three individuals work as independent contractors:  one assists with gathering and preparing the Employee information for payroll, while the other two are with a professional staffing company and provide accounting services.

81.    Employees are paid Wages bi-weekly, every other Friday; the average bi-weekly payroll for Wages is approximately $300,000.  The Debtors' most recent payroll payment was made on June 1, 2018, for the payroll period ending May 25, 2018.  The next payroll payment is scheduled for June 15, 2018.  As of the Petition Date, approximately $210,000 in Wages is accrued and owed to Employees, with no Employee owed in excess of the Statutory Cap.  Two of the Independent Contractors are paid through accounts payable, with SCI spending approximately $26,000 per month for their services.  As of the Petition Date, approximately $35,000 is due and owing for the accounting services.  Additionally, SCI's average bi-weekly obligation for Payroll Taxes is approximately $90,000, with approximately $65,000 having accrued as of the Petition Date.

82.    Employees begin to accrue PTO as soon as they begin working at SCI, and PTO is capped at different amounts for Employees based on years of service and position held.  Employees may roll over up to 40 hours of PTO, and SCI pays out accrued but unused PTO upon Employee departure.  As of the Petition Date, approximately $260,000 in PTO is accrued and outstanding.

83.    SCI has established certain benefit plans for eligible Employees that provide, among other benefits, medical, dental and vision insurance, life insurance, disability insurance,

and retirement plans.  Nearly all of the Employees participate in the Employee Health Plans.  On average, SCI incurs approximately $95,000 per month on account of the Employee Health Plans. The Debtors believe that, as of the Petition Date, there is approximately $19,000 in accrued and unpaid fees in connection with the Employee Health Plans.  Additionally, SCI contributes a total of $6,000 to Employee HSAs each month.  The Debtors believe that, as of the Petition Date, $9,000 is accrued and unpaid in connection with the HSAs.

84.     SCI provides Mutual of Omaha Insurance to the Employees, covering 100% of the average monthly premium of $5,000.  The Debtors believe that no amounts are accrued and unpaid in connection with the Mutual of Omaha Insurance as of the Petition Date.  SCI also offers Employees additional insurance plans to cover excess medical costs through All State Insurance. The average monthly premium of $5,000 for this Critical Illness Insurance is fully funded by participating Employees; as of the Petition Date, the Debtors believe no amounts are accrued and unpaid.

85.     SCI offers Employees the opportunity to enroll in the 401(k) Plan administered by John Hancock.  SCI can match Employee contributions, though it has not done so for 2018.  SCI withholds approximately $22,000 per month from participating Employees' paychecks in connection with the 401(k) Plan and requests authority to maintain and continue its prepetition practices with respect to the 401(k) Plan.

86.     SCI offers its Employees certain other insurance and utilizes a reimbursement plan for business expenses incurred by its Employees.  Overall, the Debtors believe prepetition amounts due and owing on account of miscellaneous fees and reimbursable expenses will not exceed $15,000.

I.     **Motion of the Debtors for Entry of an Order Authorizing the Retention and Payment of Professionals Utilized by the Debtors in the Ordinary Course of Business.**

87.     The Ordinary Course Professionals provide services for the Debtors in a variety of matters unrelated to these Chapter 11 Cases, including accounting services and auditing and tax services.    The Debtors seek authority to retain Ordinary Course Professionals without the submission of separate retention applications and the issuance of separate retention orders for each individual professional.    The Ordinary Course Professionals will not be involved in the administration of these Chapter 11 Cases, but rather, will provide services in connection with the Debtors' ongoing business operations.    As a result, the Debtors believe that the Ordinary Course Professionals are not "professionals" as that term is used in sections 327 or 328 of the Bankruptcy Code, whose retention must be approved by this Court.

88.     The Debtors propose that they be permitted to pay each Ordinary Course Professional, without prior application to the Court, 100% of the fees and disbursements incurred by such professional after the Petition Date; *provided, however*, that while these Chapter 11 Cases are pending, the fees of each Ordinary Course Professional that are payable by the Debtors, excluding costs and disbursements, may not exceed $35,000.00 per month or $50,000.00 in the aggregate per Ordinary Course Professional.

J.     **Motion of the Debtors for Entry of an order (A) Establishing Procedures for Asserting, Resolving, and Satisfying Reclamation Claims; and (B) Granting Related Relief.**

89.     Before the Petition Date and in the ordinary course of the Debtors' business, the Debtors purchased a variety of goods, components, raw materials, parts, machinery, equipment, and other property on varying credit terms for use in their operations.    As of the Petition Date, the

Debtors may be in possession of certain Goods delivered by various vendors, suppliers, or other sellers of Goods for which the Debtors have neither been invoiced nor made payment.

90.     As a result of these Chapter 11 Cases, the Debtors anticipate that Sellers will likely assert Reclamation Claims against the Debtors.  The Debtors also anticipate that some Sellers may attempt to interfere with the delivery of Goods to the Debtors or repossess delivered Goods from the Debtors' manufacturing facility.  Any such actions by Sellers may result in claim-by-claim litigation, or may disrupt the Debtors' operations, potentially in a manner negatively affecting enterprise value or the Debtors' reorganization efforts.

91.     To avoid harm to the Debtors' efforts to reorganize arising from any piecemeal litigation or delays and disruptions in the delivery or use of the Goods, the Debtors propose the Reclamation Procedures for asserting, processing, and satisfying Reclamation Claims.  By the Motion, the Debtors request that all Sellers be prohibited from seeking other means for the resolution or other satisfaction of Reclamation Claims, including, without limitation, (i) commencing adversary proceedings or contested matters against the Debtors in connection with any Reclamation Claim except as the Reclamation Procedures permit; (ii) seeking to regain possession of any Goods except as the Reclamation Procedures permit; or (iii) interfering with the delivery of any Goods to the Debtors or the retention of any Goods by the Debtors.

**K.     Motion of the Debtors for Entry of an Administrative Order Establishing Procedures for Monthly, Interim, and Final Compensation and Reimbursement of Expenses of Professionals Retained in these Chapter 11 Cases and Reimbursement of Expenses of Committee Members Appointed in theses Chapter 11 Cases.**

92.     By the Motion, the Debtors seek to establish procedures for the payment of fees and reimbursement of expenses for Professionals retained pursuant to Court order.  The Debtors

request that the Court exercise its discretion and allow monthly Compensation for Professionals in these Chapter 11 Cases.

93.     The Debtors have filed or will file a number of applications, including an application to retain Greenberg Traurig, LLP as their bankruptcy counsel, MCA Financial Group, Ltd. as their financial advisor, and JND Corporate Restructuring as their claims and noticing agent as well as their administrative agent.  With the likely involvement of additional Professionals, including Professionals for any official committees, the professional fee application and review process could be exceptionally burdensome on the Debtors, the U.S. Trustee, the Professionals, and the Court.  Implementation of the proposed Compensation Procedures will provide an efficient structure for disbursing Compensation to the Professionals and will allow all parties to these Chapter 11 Cases to monitor the monthly accrual of Compensation for each Professional.

94.     The Debtors will include all payments made to Professionals in accordance with the Compensation Procedures in their monthly operating reports identifying the amount paid to each of the Professionals.

**L.     Debtors' Application for Entry of an Order Authorizing Debtors to Employ and Retain JND Corporate Restructuring as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and LBR 2002-1(f).**

95.     The Debtors seek entry of an order authorizing the employment and retention of JND Corporate Restructuring ("**JND**") as the "Claims and Noticing Agent" in these Chapter 11 Cases.  The Debtors and their advisors obtained and reviewed engagement proposals from three court-approved claims and noticing agents to ensure selection of a Claims and Noticing Agent through a competitive process.

96.     Following that review, and in consideration of the anticipated notice parties being in excess of 1,000, the nature of the Debtors' business, and JND's competitive and reasonable rates

given their quality of services and expertise, the Debtors selected JND to act as the Debtors' Claims and Noticing Agent. The retention of JND as Claims and Noticing Agent is necessary and in the best interest of the Debtors' estates. JND will relieve the burdens associated with claims and noticing services, allowing the Debtors to devote their attention and resources to maximize value for their stakeholders and facilitate the orderly administration of these Chapter 11 Cases.

97.     The Debtors and their advisors reviewed JND's Services Agreement, a copy of which is attached as Exhibit B to the JND Application, and description of services that JND will render in these Chapter 11 Cases, JND's compensation and other terms of the engagement. Based on that review, the Debtors believe that all parties in interest will benefit as a result of JND's experience and cost-effective methods.

**M.     Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Prepetition Customer Practices and Programs in the Ordinary Course of Business**

98.     Prior to the Petition Date, in the normal course of business, and to accommodate its customers' needs, the Debtors implemented certain rebates, chargebacks, promotions, other discounts, and refunds to their customers in satisfaction of accrued prepetition obligations incurred by the Debtors in the ordinary course of business (the "**Customer Programs**") to pharmaceutical companies, retailers and pharmacies.

99.     The success and viability of the Debtors' business and the Debtors' ability to successfully maximize value for the stakeholders in these Chapter 11 Cases are dependent in large part upon the patronage and loyalty of their customers. To spur sales, maintain their customer base and induce prompt payment, the Debtors maintain various rebate, chargeback, promotion and other discount policies with respect to their customers. The Customer Programs are fundamental to the continued success of the Debtors' business because, by design, the Customer Programs encourage repeat business and ensure customer satisfaction, thereby retaining current customers, attracting

new customers and ultimately increasing the Debtors' revenue. Maintaining the Customer Programs is critical to the continuation of customer loyalty and satisfaction, and failure to continue these programs would severely and irreparably impair the Debtors' customer relations. If the Debtors were unable to offer the Customer Programs, they would be at a significant disadvantage compared to their competitors. Therefore, the ability to continue to provide the Customer Programs is vital to the Debtors' ongoing relationship with their current and future customers, and their ability to maintain their market share and customer base, as is critical to effectuate successfully a sale of all or substantially all their assets pursuant to section 363 of the Bankruptcy Code.

100.    These Customer Programs fall generally into one of two product-line categories as follows:

101.    Ocean Blue Customer Program. The Debtors maintain a Customer Program in connection with its Ocean Blue Line of highly concentrated omega-3 fatty acid fish oil supplements (the "**Ocean Blue Customer Program**"). Pursuant to the Ocean Blue Customer Program, qualifying customers may be entitled to competitive incentives in the form of rebates, promotions and other discounts. These incentives are determined on a monthly or even weekly basis in response to the competitive environment for omega-3 supplements. In accordance with the Ocean Blue Customer Program, during the five (5) month period from January 2018 to May 2018, the Debtors applied a monthly average of approximately $32,000 in rebates, chargebacks, promotions and other discounts. Due to the nature of the Ocean Blue Customer Program, the Debtors are unable to estimate the total amount remaining to be applied by the Debtors under the program as of the Petition Date.

102.    Prenatal Vitamins and Dental Health Supplements Customer Program. The Debtors maintain a Customer Program in connection with its Prenatal Vitamins and Dental Health

Supplements Line (the "Prenatal Vitamins and Dental Health Supplements Customer Program").

Pursuant to the Prenatal Vitamins and Dental Health Supplements Customer Program, qualifying customers may be entitled to competitive incentives in the form of rebates, chargebacks, promotions and other discounts. These incentives are determined on a monthly or even weekly basis in response to the competitive environment for prenatal vitamins and fluoride-based dental health supplements. In accordance with the Prenatal Vitamins and Dental Health Supplements Customer Program, during the five (5) month period from January 2018 to May 2018, the Debtors applied a monthly average of approximately $504,000 in rebates, chargebacks, promotions and other discounts. Due to the nature of the Prenatal Vitamins and Dental Health Supplements Customer Program, the Debtors are unable to estimate the total amount remaining to be applied by the Debtors under the program as of the Petition Date.

**N.      Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (B) Authorizing Banks to Honor and Process Related Checks And Electronic Transfers; And (C) Granting Related Relief**

103.      In an exercise of business judgment, the Debtors have determined that continuing to receive specialized goods and services from certain critical vendors and service providers (the "**Critical Vendor Claimants**", whose claims are "**Critical Vendor Claims**") is necessary to operate and restructure their business as a going concern and to maximize value for all creditors. If granted discretion to satisfy Critical Vendor Claims, as requested in this motion, the Debtors will assess, case by case and in real time, the benefits to their estates of paying Critical Vendor Claims and pay such claims only to the extent their estates will benefit. Without this relief, the Debtors believe that the Critical Vendor Claimants would cease providing goods and services to the Debtors or otherwise take action to impede the Debtors' restructuring—a dire result for the Debtors and their stakeholders.

104.    The Debtors' businesses depend on, among other things, the Debtors' ability to retain their vendors and service providers and to maintain their reputation and customer loyalty within the pharmaceutical industry.    To operate efficiently their business, the Debtors rely significantly on third parties who supply the Debtors with essential goods and services.

105.    The Debtors have thoroughly reviewed their business relationships and identified the Critical Vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' businesses.    To identify the Critical Vendors, the Debtors reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria:  (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) the Debtors' ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (c) which suppliers would be prohibitively expensive to replace, (d) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide, (e) the extent to which suppliers may have an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code; and (f) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to the Debtors postpetition if its prepetition balances are not paid, considering, for example, whether the particular vendor is under a contractual obligation to perform.

106.    Under these criteria, the Critical Vendors generally fall into one or more of five categories:

"**Lead Product Candidate Consultants and Suppliers**":  The consultants are chemists and specialized scientists who assist in the formulation and testing of the lead product in connection with the pharmaceutical development process.

Suppliers provide materials used in the formulation of the development of the lead candidate product.

**"Ocean Blue Suppliers"**:  These supplies provide the raw materials used in the Ocean Blue Product Line.

**"Suppliers of Multiple Products"**:  These supplies provide the raw materials used in the production of the Prenatal and Dental Health Supplements Product Line.

**"Operations and Merchant Services"**: The Debtors use multiple vendors to provide services essential to their ability to ensure efficient and reliable operations and merchant services, ranging from hosting and processing the electronic data interchange site between Sancilio and many of its larger customers (i.e., how sales orders are placed with Sancilio from its customers) to merchant services accounts that process customer payments in a timely and efficient manner. Any loss of these vendors during this critical time following the commencement of these Chapter 11 Cases, and any delay in the ability to place sales orders or process payments, will impair the Debtors' efforts to preserve and maximize the value of their estates and to successfully implement contemplated asset sales.

**"Regulatory Rebates"**: Certain programs administered by state agencies and participating drug manufacturers.  These programs help to offset part of the costs of most outpatient prescriptions drugs dispensed to individual beneficiaries. Participating manufacturers, including the Debtors, are responsible for paying a rebate on those drugs that were dispensed and/or paid for, as applicable, under the state plan. These rebates are paid by manufacturers on a quarterly basis to states and are shared between the states and the federal government to partially offset the overall cost of prescription drugs.

107.    If the Critical Vendors are not paid, their resulting unwillingness to continue to provide products or services would cause an interruption of the Debtors' operations.  Such an interruption would cause the Debtors irreparable harm, which would jeopardize the Debtors' ability to continue to operate their business in the ordinary course.  Paying the Critical Vendors would permit the Debtors to maintain the value of the businesses, maximizing value for the benefit of creditors and stakeholders.  Therefore, the Debtors seek authorization to pay Critical Vendor Claims to ensure the Debtors' continued receipt of goods and services and favorable credit terms from the Critical Vendors.

108.    The Debtors estimate that, as of the Petition Date, the aggregate amount of the prepetition accounts payable is approximately $3.5 million, of which the majority will be due and owing within thirty days after the Petition Date.

## V.
## Conclusion

109.    For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving the Debtors' objectives in these Chapter 11 Cases for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions, and I respectfully request that the Court do so.

*[Signature Page Follows.]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  June 5 , 2018

_____
Geoffrey Glass
Chief Executive Officer

## Exhibit A

### Corporate Structure Chart

