# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Sancilio Pharmaceuticals Company, Inc., *et al.*,[1] | Case No. 18-11333 (CSS) |
| Debtors. | (Joint Administration Requested) |

**MOTION FOR THE ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING DEBTOR-IN-POSSESSION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362, AND 364 AND FED. R. BANKR. P. 2002, 4001 AND 9014 AND LOCAL BANKRUPTCY RULE 4001-2; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363 OF THE BANKRUPTCY CODE; (III) GRANTING ADEQUATE PROTECTION AND SUPER-PRIORITY ADMINISTRATIVE CLAIMS; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move the Court (this "Motion"), pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the District of Delaware (the "Local Rules"), for entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim DIP Order"), and a final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"), providing:

A. Authorization and approval for the Debtors to incur post-petition indebtedness (the "DIP Facility"), which includes (i) the aggregate principal amount of not more than $5,300,000 in new borrowings ("DIP Loans"), of which the aggregate principal amount of not more than $1,000,000 will be available to the Debtors on an interim basis in weekly draws in accordance with the Budget and pursuant to the Interim DIP Order during the period from the Closing Date to the entry of the Final DIP Order; (ii) $265,000, constituting the DIP

---

[1] The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are:  Sancilio Pharmaceuticals Company, Inc., 2129 N. Congress Avenue, Riviera Beach, FL 33404 (3353); Sancilio & Company, Inc., 2129 N. Congress Avenue, Riviera Beach, FL 33404 (7166); Blue Palm Advertising Agency, LLC, 2129 N. Congress Avenue, Riviera Beach, FL 33404 (n/a).

Facility origination fee (the "Origination Fee"), which shall be approved by the Interim DIP Order, deemed fully earned on the date of entry of the Interim DIP Order, and paid from the proceeds of the first DIP Loan draw (the DIP Loans and Origination Fee approved pursuant to this Interim DIP Order constituting the "Interim DIP Facility"); and (iii) a DIP Facility termination fee equal to five percent (5%) of (a) the total aggregate maximum principal amount of all Applicable Commitments of all Credit Facilities (without giving effect to any reduction in or elimination of the Applicable Commitments upon the occurrence of a Default or DIP Event of Default), including the principal amounts of all undisbursed tranches, *plus* (b) all Protective Advances, which shall be approved by the Final DIP Order and deemed fully earned on the date of entry of the Final DIP Order and paid on the earliest to occur of (x) the Maturity Date, (y) the date of any full prepayment of the Credit Facilities (or, in the case of a mandatory full prepayment, on the date such mandatory prepayment becomes due and payable) or (z) the date on which the DIP Obligations become due and payable in full (the "Termination Fee"), all of which shall be on the terms and conditions set forth in (a) the Debtor in Possession Credit and Security Agreement dated as of June 5, 2018 (as may be amended from time to time, the "DIP Loan Agreement") by and among the Debtors, as Borrowers, MidCap Funding XVIII Trust, as the DIP Agent (in such capacity, the "DIP Agent"), and MidCap Funding XVIII Trust and each of the other lenders from time to time party thereto (collectively, the "DIP Lenders"), and (b) all other financing statements, mortgages, deeds of trust, deeds to secure debt, pledge agreements, affidavits, security agreements, fixture filings, assignments, memoranda or other documents, instruments or evidences of perfection with respect to the DIP Collateral (as defined below) as may be acceptable to the DIP Agent and the Required DIP Lenders (together with the DIP Loan Agreement, the "DIP Loan Documents");

B. Authorization, pursuant to section 364(c)(1) of the Bankruptcy Code, to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, as security for the DIP Obligations (as defined below), an allowed Super-priority Claim in the Chapter 11 Cases, which Super-priority Claim is a super-priority, administrative expense claim that has priority over all other administrative expenses and other claims against the Debtors in the Chapter 11 Cases, including, without limitation, any other super-priority claims;

C. Authorization, pursuant to section 364(c)(2) of the Bankruptcy Code, to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, fully-perfected and enforceable senior, first priority liens on and security interests in DIP Collateral that is not subject to a Permitted Lien;

D. Effective upon entry of the Final DIP Order, authorization, pursuant to section 364(c)(2) of the Bankruptcy Code, to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, fully-perfected and enforceable, senior, first-priority liens on and security interests in all proceeds of Avoidance Actions;

E. Authorization, pursuant to section 364(d) of the Bankruptcy Code, to grant to the DIP Agent, for the benefit of itself and the DIP Lenders, fully perfected, enforceable, first priority, priming DIP Liens (as defined below) on all DIP Collateral subject to a Lien as of the Petition Date, other than on DIP Collateral subject to a Permitted Lien, which DIP

Collateral shall be subject to fully perfected and enforceable junior priority DIP Liens granted to the DIP Agent, for the benefit of itself and the DIP Lenders, pursuant to section 364(c)(3) of the Bankruptcy;

F.   Authorization of the Debtors to use Cash Collateral (as defined below) in which the Prepetition Agent (as defined below) has an interest;

G.   Authorization to grant adequate protection to the Prepetition Agent for the ratable benefit of the Prepetition Secured Parties (as defined below), for any Diminution in Value (as defined below) of its Prepetition Collateral (as defined below), including (i) effective and perfected upon the entry of this Interim DIP Order, the Adequate Protection Liens (as defined below), (ii) effective upon the entry of the Interim DIP Order, the Adequate Protection Super-priority Claim (as defined below), subject to (a) the Carve-Out and (b) junior only to the DIP Super-priority Claim (as defined below) of the DIP Agent, and (iii) current cash payments payable under the Prepetition Loan Documents (as defined below) to the Prepetition Agent for the benefit of the Prepetition Secured Parties, for all professional fees and expenses incurred by the Prepetition Agent in connection with enforcement of the Prepetition Loan Documents and the Chapter 11 Cases;

H.   For an interim hearing (the "Interim Hearing") on the Motion be held before this Court on or prior to June 8, 2018, to consider entry of this Interim DIP Order;

I.   For a final hearing (the "Final Hearing") on or prior to June 29, 2018, to consider entry of the Final DIP Order authorizing and approving, on a final basis, all of the relief requested in the Motion and DIP Loan Documents, including the full amount of the DIP Facility; and

J.   related relief.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Geoffrey Glass in Support of the Debtors' Chapter 11 Petition and Requests for First Day Relief* (the "First Day Declaration") filed concurrently herewith.[2]  In further support of this Motion, Debtors respectfully state:

**<u>Status of the Case</u>**

1.     On the date hereof (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

---

[2]  Unless otherwise stated, capitalized terms used but not defined in this Motion have the meaning ascribed to them in the First Day Declaration or the DIP Loan Agreement.

2.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these Chapter 11 Cases.

## Jurisdiction, Venue and Statutory Predicates

4.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief set forth herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2.

## Background

### A.      The Debtors

6.      Sancilio is a private pharmaceutical development and manufacturing company. Its business is comprised of multiple business lines including:  (i) the development of proprietary prescription medicines using a unique and proprietary solubility enhancement technology called Advanced Lipid Technologies ("**ALT**"); (ii) over-the-counter and behind-the-counter omega-3 dietary supplements under the brand "Ocean Blue"; (iii) prenatal vitamins and dental health supplements that operate as "generics" dispensed at pharmacies; and (iv) third-party development and manufacturing services for other companies.  Sancilio's lead product candidate under the ALT platform is a product for the treatment of sickle cell disease in the pediatric population.

7.      In 2017, Sancilio began experiencing increasingly constrained access to additional capital and liquidity and, by late 2017, endured a liquidity crisis.  In early 2018, Sancilio secured an additional $5 million in equity capital to serve as bridge financing to pay overdue trade payables pending an expected sale of the company, but that transaction was not consummated. Accordingly, Sanclio began exploring its strategic alternatives including a further recapitalization, refinancing or sale.  Notwithstanding these efforts, Sancilio received no executable offer for recapitalization or refinancing.

8.      Since mid-April the Debtors' liquidity needs have been met from protective overadvances funded by the Prepetition Lenders (as defined below).  Having no executable path to a recapitalization or refinancing, the Debtors' commenced these cases to preserve themselves as a going concern and to maximize the value of their estates.  The Debtors' objectives in these Chapter 11 Cases are to sell all or substantially all their assets pursuant to section 363 of the Bankruptcy Code in a flexible manner allowing for bids on all their assets, one or more of their business lines, or any combination thereof.

9.      A detailed factual background of the Debtors' business and operations, as well as the events precipitating the commencement of these Chapter 11 Cases, is more fully set forth in the *Declaration of Geoffrey Glass in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

**B.      The Debtors' Prepetition Capital Structure**

10.     As of the Petition Date, the Debtors' capital structure is as follows:

***i.      Prepetition Secured Loans***

11.     Before the Petition Date, the Debtors and MidCap Financial Trust, as agent (in such capacity, the "**Prepetition Agent**") for the Lenders thereunder and the financial institutions

or other entities from time to time party thereto as Lenders (collectively, the "**Prepetition Lenders**," and together with the Prepetition Agent, the "**Prepetition Secured Parties**") entered into that certain (i) Credit and Security Agreement, dated as of February 1, 2016 (as amended by that certain First Amendment to Credit and Security Agreement and Limited Waiver, dated as of April 13, 2017; (ii) Second Amendment to Credit and Security Agreement and Limited Waiver, dated as of October 23, 2017; (iii) Third Amendment to Credit and Security Agreement, dated as of January 2, 2018; and (iv) Omnibus Fourth Amendment to Credit and Security Agreement and First Amendment to Third Amendment to Credit and Security Agreement, dated as of January 8, 2018, the "**Prepetition Loan Agreement**").

12.    After entry into the Prepetition Loan Agreement but before the Petition Date, the Prepetition Agent declared a default pursuant to that certain Notice of Default and Reservation of Rights Letter, dated April 6, 2018, delivered to SCP.  Thereafter, the Debtors and the Prepetition Secured Parties entered into that certain (i) Protective Advance Letter, dated April 12, 2018; (ii) Second Protective Advance Letter, dated April 26, 2018; (iii) Third Protective Advance letter, dated May 3, 2018; (iv) Fourth Protective Advance Letter, dated May 10, 2018; (v) Fifth Protective Advance Letter, dated May 17, 2018  (the foregoing Protective Advance Letters and the Prepetition Loan Agreement, and together with will all other agreements, documents and instruments, entered into or delivered in connection with the foregoing, collectively, the "**Prepetition Loan Documents**"), pursuant to which, among other things, the Prepetition Lenders made certain loans and other financial accommodations to the Debtors in aggregate principal amount of not less than $18,114,500 (collectively, the "**Prepetition Secured Loans**").

13.    The Prepetition Secured Loans are secured by first-priority, fully-perfected security interests in and liens on all of Debtors' right, title and interest in, to and under the

"Collateral" as defined in the Prepetition Loan Documents (the "**Prepetition Collateral**"), including Cash Collateral (as defined in the DIP Loan Agreement).

### ii.    *Unsecured Claims*

14.    As of the Petition Date, the Debtors have unsecured obligations, not including any deficiency claims, in the approximate amount of $5,008,299.72, consisting of accounts payable to various trade creditors.

### iii.    *Preferred and Common Stock*

15.    Before the Petition Date, SCP funded the Debtors' operations, working capital needs and investments, *inter alia*, through the issuance of redeemable convertible preferred stock.  As of the Petition Date, SCP has five series of preferred stock are outstanding.

16.    As of the Petition Date, SCP's common stock is privately held.  Certain of the holders of SCP's preferred stock and common stock have entered into the Fourth Amended and Restated Stockholders' Agreement, dated as of January 9, 2018,

### C.    Approval of the DIP Facility and Authorization to Use Cash Collateral is Necessary to Meet the Debtors' Immediate Need for Liquidity

17.    Since mid-April 2018, the Debtors have relied upon protective overadvances from the Prepetition Lenders to continue operations and preserve value.  Had the Debtors relied solely on revenues from operations without these protective overadvances, significant business disruptions would almost certainly have resulted.  As projected in the Budget, it remains the case after the Petition Date that projected revenues are likely to be insufficient to fund adequately the Debtors' operations and working capital needs and the additional cash flow required to fund the administrative expenses of these Chapter 11 Cases.  Absent both approval of the DIP Facility and authorization to use Cash Collateral, the Debtors will almost certainly experience business disruptions.  Moreover, the Debtors believe that approved and demonstrated access to liquidity

through the DIP Facility and use of Cash Collateral is essential to provide the Debtors' employees, vendors and service providers, and other stakeholders confidence in the Debtors' ability to continue operating while it pursues a sale of all or substantially all the Debtors' asset pursuant to section 363 of the Bankruptcy Code (the "**Section 363 Sale**").

18. Accordingly, the Debtors have an immediate and compelling need for access to both the DIP Facility and Cash Collateral. Among other things, this access is necessary to among other things, continue the operation of its business in an orderly manner, maintain business relationships with customers and vendors, pay employees and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtor's going-concern value and, ultimately, conduct successfully a Section 363 Sale. Based on these circumstances, the Debtors require the funding provided by the proposed DIP Facility and use of Cash Collateral to avoid immediate and irreparable harm to its operations, business and estate.

19. In addition, for the reasons set forth more fully below and in the First Day Declaration, the Debtors believe unsecured financing is not available, nor is financing on a junior or *pari passu* secured basis, and the terms and conditions of the DIP Facility, and of the proposed use of Cash Collateral in exchange for the Adequate Protection are fair and reasonable, and the Debtors' best option to finance their liquidity needs for these Chapter 11 Cases.

## Summary of the Terms and Conditions of the Proposed DIP Facility[3]

### A.  Summary of Essential Terms under Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(ii)

20.     Pursuant to Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a)(ii), the following chart summarizes the essential terms of the proposed DIP Facility, together with references to applicable sections of the relevant source documents.

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| **DIP Credit Agreement Parties** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B);   Local R. 4001-2(a)(ii) | **Borrowers:**  The Debtors <br><br> **Guarantors:**  None <br><br> **Agent:**  MidCap Funding Trust XVIII <br><br> **Lenders:**  MidCap Funding Trust XVIII and the other lenders listed on the Credit Facility Schedule attached hereto and otherwise party to the DIP Loan Agreement from time to time <br><br> *See* DIP Loan Agreement, Recitals |
| **Commitment** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | The DIP Facility shall be the aggregate principal amount of not more than $5,300,000 in new borrowings, of which the aggregate principal amount of not more than $1,000,000 will be available to the Debtors on an interim basis in weekly draws in accordance with the Budget and pursuant to the Interim DIP Order during the period from the Closing Date to the entry of the Final DIP Order; (ii) an Origination Fee in the amount of $265,000; and (iii) a Termination Fee equal to five percent (5%) of (a) the total aggregate maximum principal amount of all Applicable Commitments of all Credit Facilities (without giving effect to any reduction in or elimination of the Applicable Commitments upon the occurrence of a Default or DIP Event of Default), including the principal amounts of all undisbursed tranches, *plus* (b) all Protective Advances, which shall be approved by the Final DIP Order and deemed fully earned on the date of entry of the Final DIP Order and paid on the earliest to occur of (x) the Maturity Date, (y) the date of any full prepayment of the Credit Facilities (or, in the case of a mandatory full prepayment, on the date such mandatory prepayment becomes due and |

---

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the DIP Loan Documents.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Each capitalized term used and not otherwise defined in these summaries shall have the meaning assigned thereto in the DIP Loan Agreement.

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | payable) or (z) the date on which the DIP Obligations become due and payable in full.<br><br>*See* DIP Loan Agreement, §2.2 |
| **Interest Rates and Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | <u>Interest Rate</u>: Each Credit Extension shall bear interest on the outstanding principal amount thereof from the date when made until paid in full at a rate per annum equal to the Applicable Interest Rate. Each DIP Lender may, upon the failure of the Debtors to pay any fees or interest as required herein, capitalize such interest and fees and begin to accrue interest thereon until paid in full, which such interest shall be at a rate per annum equal to the Applicable Interest Rate unless and until the Default Rate shall otherwise apply. All other DIP Obligations shall bear interest on the outstanding amount thereof from the date they first become payable by The Debtors under the DIP Financing Documents until paid in full at a rate per annum equal to the Applicable Interest Rate unless and until the Default Rate shall otherwise apply. Interest on the Credit Extensions and all fees payable under the DIP Financing Documents shall be computed on the basis of a 360-day year and the actual number of days elapsed in the period during which such interest accrues.<br><br><u>Default Interest</u>: Upon the election of DIP Agent following the occurrence and during the continuance of a DIP Event of Default, the DIP Obligations shall bear interest at a rate per annum which is three hundred basis points (3.00%) above the rate that is otherwise applicable thereto.<br><br>*See* DIP Loan Agreement, § 2.6(a), (b). |
| **Loan Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | The Debtors shall pay the following fees, all of which shall be DIP Obligations:<br>    <u>Origination Fee</u>. On the Closing Date, an origination fee equal to the sum of $265,000.00.<br><br>    <u>Termination Fee</u>. On the earliest to occur of (i) the Maturity Date, (ii) the date of any full prepayment of the Credit Facilities (or, in the case of a mandatory full prepayment, on the date such mandatory prepayment becomes due and payable) or (iii) the date on which the DIP Obligations become due and payable in full, an amount equal to five percent (5%) of (A) the total aggregate maximum principal amount of all Applicable Commitments of all Credit Facilities (without giving effect to any reduction in or elimination of the Applicable Commitments upon the occurrence of a Default or DIP Event of Default), including the principal amounts of all undisbursed tranches, plus (B) all Protective Advances.<br><br>*See* DIP Loan Agreement, § 2.6(e). |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| **Term**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | All DIP Obligations, to the extent not already paid or satisfied, shall be repaid in full (subject to the Carve-Out) on the earliest to occur of: (i) the Interim DIP Facility Maturity Date, (ii) the closing of the 363 Sale, (iii) the occurrence of a DIP Event of Default, and (iv) August 31, 2018.<br><br>*See* DIP Loan Agreement, § 2.6(d) |
| **Use of DIP Facility**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | Subject to terms and conditions of the DIP Loan Agreement, (a)    the Debtors shall use the proceeds of the Credit Extensions solely in accordance with the terms of the Budget, including: (i) to pay (a) all reasonable fees due to the DIP Lenders and DIP Agent, (b) all professional fees and expenses (including reasonable fees and expenses of attorneys (including counsel for the Debtors, Greenberg Traurig LLP, and counsel to DIP Agent and DIP Lenders, Hogan Lovells US LLP), local counsel to DIP Agent and DIP Lenders, and financial advisors), incurred by the DIP Lenders and DIP Agent, including those incurred in connection with the preparation, negotiation, documentation and Bankruptcy Court approval of the DIP Facility, and (c) Adequate Protection payments as set forth in Section 4.5, and (ii) to provide working capital, and for other general corporate purposes of the Debtors, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court as set forth in the Budget.<br><br>*See* DIP Loan Agreement, § 6.9(a). |
| **Limitations on Use of DIP Facility**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | Notwithstanding the foregoing, no portion of Cash Collateral, if any, the DIP Facility, the DIP Collateral or the Carve-Out may be used:<br>    (i)    for any purpose that is prohibited under the Bankruptcy Code or a Chapter 11 Order;<br>    (ii)    to finance in any way, (i) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the interests of any or all of DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders or their respective rights and remedies under the DIP Financing Documents, the Interim DIP Order, the Final DIP Order or the Prepetition Financing Documents, or (ii) any other action which with the giving of notice or passing of time would result in a DIP Event of Default under the DIP Financing Documents;<br>    (iii)    for the payment of fees, expenses, interest or principal under the Prepetition Financing Documents (other than the permitted Adequate Protection payments as set forth in Section 4.5);<br>    (iv)    to make any distribution under a plan of reorganization in the Chapter 11 Cases;<br>    (v)    to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | without the prior written consent of the Required DIP Lenders; and/or<br>    (vi)   for any purpose or in any manner not approved in the Budget or by the Required DIP Lenders.<br><br>*See* DIP Loan Agreement, § 6.9(b). |
| **Conditions Precedent**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | The obligation of the DIP Administrative Agent and DIP Lenders to make the Interim DIP Facility available to the Debtor shall be subject to the prior or concurrent satisfaction by the Debtor (unless waived by the Required DIP Lenders) of each of the following:<br>    1.   With respect to Credit Facility #1, duly executed and delivered copies of the DIP Financing Documents.<br>    2.   Duly executed original Secured Promissory Notes in favor of each DIP Lender with a face amount equal to such DIP Lender's Applicable Commitment under each Credit Facility, if requested under Section 2.7.<br>    3.   Written evidence (including any UCC termination statements) that any Liens indicated in any financing statements provided or obtained under Section 3.5 or otherwise either constitute Permitted Liens or have been or, in connection with the initial Credit Extension, will be terminated or released.<br>    4.   Payment of the fees and expenses of DIP Agent and DIP Lenders then accrued and approved pursuant to the Chapter 11 Orders.<br>    5.   Timely receipt by DIP Agent of an executed and delivered loan disbursement statement.<br>    6.   All possessory collateral required to be delivered to DIP Agent with corresponding endorsements pursuant to Section 4.2(b).<br>    7.   With respect to Credit Facility #1, the Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the First Day Orders shall have been reviewed in advance by the DIP Lenders and DIP Agent, shall be in form and substance acceptable to the Required DIP Lenders and DIP Agent in their sole discretion.<br>    8.   With respect to Credit Facility #1, the Bankruptcy Court shall have (i) entered the Interim DIP Order, which Interim DIP Order shall be in form and substance satisfactory to the sole discretion of DIP Agent and DIP Lenders and, and (ii) authorized, confirmed and approved all terms and provisions of this Agreement and other DIP Financing Documents.<br>    9.   With respect to Credit Facility #2 only, the Bankruptcy Court shall have (i) entered the Final DIP Order, which Final DIP Order shall be in form and substance satisfactory to the sole discretion of DIP Agent and DIP Lenders and, and (ii) authorized, confirmed and approved all terms and provisions of this Agreement and other DIP Financing Documents.<br>    10.   The Debtors shall be in compliance in all material |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | respects with (i) with respect to Credit Facility #1, the Interim DIP Order and (ii) with respect to Credit Facility #2, the Final DIP Order.<br><br>11.    All First Day Orders entered by the Bankruptcy Court, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to DIP Agent and DIP Lenders in their sole discretion.<br><br>12.    The DIP Lenders and DIP Agent shall have been granted, pursuant to the Interim DIP Order, and the Final DIP Order, once entered, a perfected, first priority Lien on all DIP Collateral and shall have received UCC, tax and judgment Lien searches, and other appropriate evidence, evidencing the absence of any other Liens on the DIP Collateral, except the Permitted Liens.<br><br>*See* DIP Loan Agreement, § 3.1, Closing Deliveries Schedule |
| **Budget Covenants** Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | The Debtors shall not, directly or indirectly, (A) use any proceeds of the Credit Extensions in a manner or for a purpose other than those consistent with this Agreement and the Chapter 11 Orders; or (B) permit a disbursement causing any deviation from the Budget other than the Disbursements Permitted Deviations.<br><br>So long as no DIP Event of Default has occurred and is continuing, the Debtors shall be permitted to pay fees and expenses of Professionals solely to the extent that such fees and expenses are in accordance with the Budget and the Interim DIP Order or the Final DIP Order, as applicable, and authorized to be paid under sections 330 and 331 of the Bankruptcy Code (other than any Professionals whose fees are not subject to such provisions, if any) pursuant to an order of the Bankruptcy Court, as the same may be due and payable.  Subject to the Chapter 11 Orders, upon the occurrence of a DIP Event of Default (subject to all applicable grace periods set forth in this Agreement and the Chapter 11 Orders), the right of the Debtors to pay Professional fees and expenses shall terminate, other than as provided with respect to the Carve-Out.<br><br>To the extent the Debtors has Cash Collateral equal to or in excess of $600,000.00 on any date of determination, the Debtors are prohibited from submitting a Credit Extension Form to the DIP Agent and from borrowing any Credit Extensions.<br><br>*See* DIP Loan Agreement, §8.1(d) |
| **Reporting Information** | Compliance with the Budget shall be tested for the first week and each subsequent week on a cumulative basis beginning on the Petition Date (each, a "Budget Test Period").  During each Budget Test Period, the |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | Debtors will not permit (a) the (i) the sum of the actual Net Revenue for such Budget Test Period plus the sum of the actual Net Revenue for each previous Budget Test Period, to be less than (ii) (A) the sum of the "Total Cash Receipts" for such Budget Test Period plus the sum of "Total Cash Receipts" for each previous Budget Test Period, each as set forth in the Budget, multiplied by 80% for Week 1, 85% for Week 2 and 90% for Week 3 and thereafter ("Net Revenue Permitted Deviation"); provided that the DIP Agent, at the direction of the Required DIP Lenders, may authorize the Debtors in writing to exceed the Net Revenue Permitted Deviation for any Budget Test Period; or (b) the actual aggregate amount of disbursements set forth in the Budget to be more than 110% of the aggregate budgeted amount for such Budget Test Period set forth in the Budget and each previous Budget Test Period set forth in the Budget (the "Disbursements Permitted Deviation", and together with the Net Revenue Permitted Deviation, "Permitted Deviations"); provided that the DIP Agent, at the direction of the Required DIP Lenders, may authorize the Debtors in writing to exceed the Disbursements Permitted Deviation for any Budget Test Period.  On the first Business Day of each week, the Debtors shall deliver a Reconciliation Report to the DIP Agent in accordance with the DIP Loan Agreement. In addition, the Debtors shall notify the DIP Agent as soon as reasonably practicable if the Debtors anticipate that they will violate the Permitted Deviations in any respect for any Budget Test Period. All other provisions related to the Budget as set forth in the DIP Loan Agreement shall be adhered to by the Debtors. <br><br> *See* DIP Loan Agreement, § 8.2 |
| **Chapter 11 Milestones** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(vi); Local R.4001-2(a)(ii) | The Debtor shall comply with the following milestones in connection with the 363 Sale: <br>     (a)    As promptly as possible, but in no event later than two (2) Business Days after the Petition Date, the Debtors shall file Bidding Procedures Motion <br>     (b)    As promptly as possible, but in no event later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order; <br>     (c)    As promptly as possible, but in no event later than one (1) Business Day after entry of the Bidding Procedures Order, the Debtors shall forward so-called "bid packages" to potential bidders, subject to the terms and conditions contained in the Bidding Procedures Order; <br>     (d)    As promptly as possible, but in no event later than twenty-one (21) Business Days after entry of the Bidding Procedures Order (the "Bid Deadline"), binding bids with respect to the 363 Sale shall be due and delivered to the Loan Parties in accordance with the |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | Bidding Procedures Order (and copies of such bids shall be provided to the DIP Agent); <br><br> (e)　　As promptly as possible, but in no event later than three (3) Business Days after the Bid Deadline, the Auction shall have been completed; and <br><br> (f)　　As promptly as possible, but in no event later than five (5) Business Days after completion of the Auction, the Bankruptcy Court shall have entered an order (the "363 Sale Order") approving the 363 Sale, which order shall be in form and substance acceptable to the DIP Agent; and <br><br> (g)　　As promptly as possible, but in no event later than twelve (12) Business Days after entry of the 363 Sale Order, the Debtors shall have consummated the 363 Sale as requested in the Sale Order Motion. <br><br> *See* DIP Loan Agreement, § 6.17. |
| **Liens and Priority Claims** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(i); Local R. 4001-2(a)(i)(D), 4001-2(a)(ii) | Upon entry of the Chapter 11 Orders, and subject to the Carve-Out, at all times: <br><br> (a) all DIP Obligations, including all Credit Extensions under the DIP Facility, shall pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed Super-priority Claims in the Chapter 11 Cases, which Super-priority Claims are superior to all other Super-priority Claims and other claims against the Debtors in the Chapter 11 Cases, now or hereafter arising, of any kind whatsoever, including, for the avoidance of doubt, the Super-priority Claim granted to the Prepetition Agent and Prepetition Lenders pursuant to the Chapter 11 Orders; <br><br> (b) all Liens against the DIP Collateral securing the DIP Obligations authorized pursuant to: <br><br> (i)　　section 364(c)(2) of the Bankruptcy Code, shall constitute valid, binding, continuing, enforceable, fully-perfected first priority senior Liens upon the DIP Collateral to the extent not subject to any Permitted Liens, which DIP Collateral shall include all cash advanced as Credit Extensions and all products and proceeds of the Credit Extensions; and <br><br> (ii)　　section 364(d) of the Bankruptcy Code, shall constitute valid, fully perfected, enforceable, first priority, priming Liens on DIP Collateral that had been subject to a Lien as of the Petition Date, other than on DIP Collateral subject to Permitted Liens described in clauses (b) through (i) in the definition thereof ("Excluded DIP Collateral") (which such Excluded DIP Collateral shall be subject to fully perfected and enforceable junior priority DIP Liens in favor of the DIP Agent, for the benefit of itself and the DIP Lenders, pursuant to section 364(c)(3) of the Bankruptcy Code). <br><br> *See* DIP Loan Agreement, §4.3 |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| **Carve Out**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(i)(F) | All DIP Obligations (and the repayment thereof), Prepetition Secured Obligations, Prepetition Liens, DIP Liens, the DIP Super-priority Claim, and Adequate Protection shall be subject to and subordinate to the Carve-Out for payment of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court that are (i) incurred prior to the Maturity Date, and (ii) included in the Budget for the period prior to the Maturity Date; plus (b) all fees and expenses of professionals retained by the Debtors in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328 or 363 (collectively, the "Debtor Professionals") and any official committee of unsecured creditors or equity holders appointed in the Chapter 11 Cases (the "Committee Professionals"; collectively with the Debtor Professionals, the "Professionals"; the term "Professionals" shall exclude ordinary course professionals retained by the Debtors) that are (i) incurred prior to the Maturity Date and which have not been paid prior to the Maturity Date, (ii) allowed either prior to or after the Maturity Date, and (iii) included in the Budget (including, without limitation, the notes, provisions or reservations therein regarding the fees and expenses of Professionals) for the period prior to the Maturity Date; plus (c) all fees and expenses of the Debtor Professionals incurred and allowed after the occurrence of the Maturity Date, in an aggregate amount not to exceed $75,000.00; (d) plus all fees and expenses of the Committee Professionals incurred and allowed after the occurrence of the Maturity Date, in an aggregate amount not to exceed $15,000.00, (d) an aggregate amount not to exceed $40,000.00 to fund the Debtors' costs and expenses (other than Professional fees and expenses included in the preceding clause (c)) to conclude the Chapter 11 Cases through a plan process, structured or other case dismissal, case conversion or otherwise; plus (e) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court after the Maturity Date.  On the day on which the Maturity Date occurs, such occurrence shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Carve-Out, and the Debtors shall deposit and hold any such amounts in a segregated account in trust for purposes of satisfying amounts under the Carve-Out (the "Reserve") (it being understood that any residual amount of such segregated account shall be DIP Collateral and Cash Collateral).  To the extent the Debtors do not have sufficient cash to fund the Reserve in full, the DIP Lenders shall deposit cash into the Reserve in an amount sufficient to fully fund the Reserve.   For the avoidance of doubt and notwithstanding anything to the contrary herein, in the DIP Loan Documents or the Prepetition Loan Documents, the Carve-Out shall be senior to the DIP Liens, the DIP Super-priority Claims, the Adequate Protection Liens, the Adequate |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | Protection Super-priority Claims, any and all other forms of adequate protection, and the liens and claims securing the Prepetition Secured Obligations.  All amounts in the Reserve shall be utilized for the purposes and in the manner set forth in Paragraph 23 of the Interim DIP Order. |
| | *See* Interim DIP Order, ¶ 23 |
| **Stipulations to Prepetition Liens and Claims**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii); Local R. 4001-2(a)(i)(B) | Debtors' Acknowledgments and Agreements.  Without prejudice to the rights of any other party and subject to Paragraph 37 of the Interim DIP Order, the Debtors admit, stipulate, acknowledge and agree that:<br>    (a) Prepetition Secured Loans.  Prior to the Petition Date, the Debtors and the Prepetition Agent for the Prepetition Lenders entered into the Prepetition Secured Loans in aggregate principal amount of not less than $18,114,500.00. The Prepetition Secured Loans are secured by first priority, fully-perfected security interests in and liens on all of Debtors' right, title and interest in, to and under the Prepetition Collateral.<br>    (b) Validity and Enforceability.  (i) The Prepetition Loan Documents are valid and enforceable by the Prepetition Secured Parties against the Debtors and as between the other parties thereto, (ii) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and are secured by valid, binding, enforceable, duly perfected first priority Prepetition Liens (except as to Permitted Liens) and security interests granted by the Debtors to the Prepetition Secured Parties in the Prepetition Collateral in the amount and to the extent set forth in the Prepetition Loan Documents, including the proceeds derived therefrom, and (iii) the Prepetition Secured Parties duly perfected the Prepetition Liens securing the Prepetition Secured Obligations by, among other things, filing financing statements, recording mortgages, obtaining control over deposit accounts, and, where necessary, by possession of relevant instruments, certificates, cash or other property, and all such instruments and actions were validly executed or performed, as the case may be, by, or at the direction or with the consent of, authorized representatives of the Debtors.<br>    (c) No Challenges.  (i) No offsets, recoupments, challenges, objections, reductions, defenses, impairments, claims, counterclaims, or cross-claims of any kind or nature to any of the Prepetition Secured Parties, Prepetition Liens, Prepetition Collateral, or Prepetition Secured Obligations  (or to any amounts previously paid to the Prepetition Secured Parties on account thereof or with respect thereto) by any person or entity exist, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable, contractual, or otherwise) pursuant to the |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | Bankruptcy Code or applicable foreign or domestic law or regulation, (ii) the Debtors and their estates have no valid claims, objections, challenges, causes of actions, or choses in action, including without limitation, Avoidance Actions, against the Prepetition Secured Parties or against any of their respective affiliates, agents, attorneys, advisors, professionals, officers, managers, members, directors or employees arising out of, based upon or related to the Prepetition Liens, Prepetition Collateral, Prepetition Secured Obligations or Prepetition Loan Documents, and (iii) the Debtors irrevocably waive all rights to challenge or contest the Prepetition Liens of the Prepetition Secured Parties on the Prepetition Collateral or the validity or amount of the Prepetition Liens, Prepetition Collateral, Prepetition Secured Obligations or Prepetition Loan Documents, as applicable; <br><br> (d) <u>Cash Collateral</u>.  All of the Debtors' cash constitutes Cash Collateral or proceeds of the Prepetition Collateral and, therefore, is Cash Collateral of the Prepetition Secured Parties.  For purposes of this Interim DIP Order, the term "Cash Collateral" shall be deemed to include, without limitation: (x) all "cash collateral" as defined in section 363(a) of the Bankruptcy Code; and (y) all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Debtors in which the Prepetition Secured Parties assert security interests, liens or mortgages, regardless of whether such security interests, liens, or mortgages existed as of the Petition Date or arose thereafter pursuant to this Interim DIP Order, and whether the property converted to cash existed as of the Petition Date or arose thereafter. <br><br> *See* Interim DIP Order ¶ 10, 37. |
| **Adequate Protection** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | <u>Adequate Protection Obligations</u>.  Pursuant to the Chapter 11 Orders, the Prepetition Agent, for the benefit of the Prepetition Lenders, shall be granted the following Adequate Protection pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, in connection with: (a) (i) the priming of the Prepetition Liens securing the Prepetition Loans to be effectuated by the Liens and DIP Facility, (ii) the use of the Prepetition Collateral (including Cash Collateral), and (iii) all of the other transactions contemplated by the DIP Facility, and (b) for any diminution in the value of the Prepetition Liens of the Prepetition Agent, for the benefit of the Prepetition Lenders, whether or not such diminution in value results from the sale, lease or use by the Debtors of the Prepetition Collateral securing the Prepetition Obligations (including Cash Collateral), the priming of the Prepetition Liens securing the Prepetition Loans or the stay of enforcement of any Prepetition Lien securing the Prepetition Loans arising from sections 105 or 362 of the Bankruptcy Code, or otherwise. |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | Adequate Protection Liens.  The Prepetition Agent shall be granted for the benefit of the Prepetition Lenders, effective and perfected as of the Interim DIP Order Entry Date and without the necessity of the execution of mortgages, deeds of trust, security agreements, pledge agreements, control agreements, financing statements or other agreements, a valid and perfected security interest in and lien on all assets of the Debtors and in the same relative priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the respective Prepetition Liens in the Prepetition Collateral as described in the Interim DIP Order and the Final DIP Order, as applicable, which liens and security interests are junior and subordinate only to (i) the Carve-Out, (ii) the Liens securing the DIP Obligations, (iii) the DIP Obligations, (iv) the Super-priority Claims of DIP Agent, and (v) the Permitted Liens. <br><br> Super-priority Claim.  Pursuant to and upon the entry of the Interim DIP Order, the Prepetition Agent, on behalf of itself and the Prepetition Lenders, shall be granted, subject to the Carve-Out, an allowed Super-priority Claim junior only to the Super-priority Claim of DIP Agent and any Permitted Lien; provided that the Prepetition Agent and Prepetition Lenders shall not receive or retain any payments, property or other amounts in respect of such Super-priority Claim unless and until the DIP Obligations have indefeasibly been paid in cash in full. <br><br> Fees and Expenses.  The Debtors shall make current cash payments payable under the Prepetition Financing Documents to the Prepetition Agent for all professional fees and expenses incurred by the Prepetition Agent in connection with enforcement of the Prepetition Financing Documents and the Chapter 11 Cases, subject to the delivery of a Fee Notice, as defined in, and in the manner set forth in the Interim DIP Order. <br><br> *See* DIP Loan Agreement, § 4.4, 4.5. |
| **Waiver/Modification of the Automatic Stay; Remedies** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to the extent necessary to permit the Debtors to grant the DIP Liens to the DIP Agent and DIP Lenders and the Adequate Protection Liens to the Prepetition Secured Parties contemplated by the DIP Loan Documents and this Interim DIP Order, including, but not limited to, the right to seek additional or different adequate protection. <br><br> Following five (5) Business Days' notice of a DIP Event of Default to the Debtors, any Committee, and the Office of the U.S. Trustee, unless such DIP Event of Default is cured within such time or an order of the |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | Bankruptcy Court is entered to the contrary, the DIP Agent and the DIP Lenders shall have relief from the automatic stay to exercise remedies under the DIP Loan Documents, the Chapter 11 Orders, and applicable law. *See* Interim DIP Order ¶ 27, 34 |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | The DIP Liens and Adequate Protection Liens granted pursuant to the DIP Loan Documents and this Interim DIP Order shall constitute valid, enforceable and fully perfected security interests and liens, and the DIP Agent, DIP Lenders and the Prepetition Secured Parties shall not be required to file, record or serve financing statements, mortgages, notices of lien or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens.  The failure by the Debtors to execute, file, record or serve, or take any similar actions, with respect to any of the foregoing or similar documents or instruments relating to the DIP Liens or Adequate Protection Liens shall in no way affect the validity, enforceability, perfection or relative priority of such security interests and liens.  The DIP Agent, DIP Lenders and Prepetition Secured Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, or notices of lien or similar instruments in any jurisdiction, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, DIP Lenders or Prepetition Secured Parties shall, in their sole discretion, choose to file any of the foregoing or otherwise confirm perfection of the liens and security interests granted to them under the DIP Loan Documents and this Interim DIP Order, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of this Interim DIP Order. *See* Interim DIP Order ¶ 28. |
| **Indemnification** Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | The Debtors hereby agrees to indemnify, pay and hold harmless DIP Agent and DIP Lenders and the officers, directors, employees, trustees, agents, investment advisors, collateral managers, servicers, and counsel of DIP Agent and DIP Lenders (collectively called the "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the disbursements and reasonable fees of counsel for such Indemnitee) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | designated a party thereto and including any such proceeding initiated by or on behalf of a Credit Party, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker (other than any broker retained by DIP Agent or DIP Lenders) asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated hereby and the use or intended use of the proceeds of the Credit Facilities, except that the Debtors shall have no obligation hereunder to an Indemnitee with respect to any liability resulting from the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, the Debtors shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other DIP Financing Documents or the transactions contemplated hereby or thereby. <br><br> *See* Interim DIP Order ¶ 13.2(b). |
| **Counsel Fees & Expenses** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | Subject to the provisions of the Chapter 11 Orders concerning "Fee Notices", the Debtors hereby agrees to promptly pay (i) (A) all costs and expenses of DIP Agent (including, without limitation, the costs, expenses and reasonable fees of counsel to, and independent appraisers and consultants retained by, DIP Agent) in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated by the DIP Financing Documents, and in connection with the continued administration of the DIP Financing Documents including (1) any amendments, modifications, consents and waivers to and/or under any and all DIP Financing Documents, and (2) any periodic public record searches conducted by or at the request of DIP Agent (including, without limitation, title investigations, UCC searches, fixture filing searches, judgment, pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of certain Persons), and (B) costs and expenses of DIP Agent in connection with the performance by DIP Agent of its rights |

| Bankruptcy Rule / Local Rule | Summary of Material Terms |
|---|---|
| | and remedies under the DIP Financing Documents; (ii) without limitation of the preceding clause (i), all costs and expenses of DIP Agent in connection with the creation, perfection and maintenance of Liens pursuant to the DIP Financing Documents; (iii) without limitation of the preceding clause (i), all costs and expenses of DIP Agent in connection with (A) protecting, storing, insuring, handling, maintaining or selling any DIP Collateral, (B) any litigation, dispute, suit or proceeding relating to any DIP Financing Document, and (C) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the DIP Financing Documents; (iv) without limitation of the preceding clause (i), all costs and expenses of DIP Agent in connection with DIP Agent's reservation of funds in anticipation of the funding of the Credit Extensions to be made hereunder; and (v) all costs and expenses incurred by DIP Agent or DIP Lenders in connection with any litigation, dispute, suit or proceeding relating to any DIP Financing Document and in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all DIP Financing Documents, whether or not DIP Agent or DIP Lenders are a party thereto (provided that the fees and expenses of counsel that shall be reimbursable pursuant to this clause (v) shall in any event be limited to one primary counsel for DIP Agent, one separate primary counsel for the DIP Lenders as a whole, one local counsel in each reasonably necessary jurisdiction, one specialty counsel in each reasonably necessary specialty area, and one or more additional counsel if one or more conflicts of interest arise).  If DIP Agent uses in-house counsel for any of these purposes, the Debtors further agrees that the DIP Obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by DIP Agent for the work performed.<br><br>*See* Interim DIP Order ¶ 13.2(a). |

**B.    Highlighted Provisions under Local Rule 4001-2(a)(i)**

21.    Local Rule 4001-2(a)(i) requires this Motion to recite whether the DIP Orders or the other DIP Documentation contain any of the following seven provisions and, to the extent such provisions are present, to identify their location in the relevant documents justify their inclusion.

(i)    **Local    R. 4001-2(a)(i)(A)—*Cross-Collateralization    Protection*.**    Not Applicable—the DIP Facility does not include cross-collateralization provisions.

(ii)    **Local R. 4001-2(a)(i)(B)—*Challenge Period***.  Not applicable—the Interim DIP Order provides for seventy-five (75) days from entry of the Interim DIP Order, and with respect to a creditors' committee, if formed, sixty days (60) days from the date of its formation, before the stipulations and findings set forth in the Interim DIP Order become binding .

(iii)   **Local R. 4001-2(a)(i)(C)—*506(c) Waiver***.  Upon entry of the Final DIP Order, the right, if any, of any person or entity to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code is waived, subject to the Carve-Out.  *See* Interim DIP Order ¶ 49.

(iv)    **Local R. 4001-2(a)(i)(D)—*Liens on Avoidance Actions***.  Upon entry of the Final DIP Order, the DIP Liens will include the proceeds of all Avoidance Actions.  *See* Interim DIP Order §16(d).

(v)     **Local R. 4001-2(a)(i)(E)—*Roll-Up***.  Not applicable—the DIP Facility does not contain provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.

(vi)    **Local R. 4001-2(a)(i)(F)—*Disparate Carve Out Treatment***.  The DIP Facility does not provide for disparate carve-out treatment for the professionals retained by any creditors' committee from the professionals retained by the Debtors, provided that, after the Maturity Date, the amount reserved for the Debtor Professionals is $75,000, and that for the Committee Professionals is $15,000.

(vii)   **Local R. 4001-2(a)(i)(G)—*Nonconsensual Priming***.  Not applicable—the DIP Facility does not provide for nonconsensual priming of any valid, enforceable and perfect liens.

(viii)  **Local R. 4001-2(a)(i)(H)—*Section 552(b)(1)***.  Upon entry of the Final DIP Order, provides the DIP Lenders and Prepetition Secured Parties all of the rights and benefits of section 552(b)(1) of the Bankruptcy Code and the "equities of the case" exception therein shall not apply.  *See* Interim DIP Order ¶ 47.

22.     For the reasons discussed below, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these Chapter 11 Cases and should be approved.

## Relief Requested

23.     The Debtors seek entry of the Interim DIP Order and, pending the Final Hearing, the Final DIP Order, in each case: (a) authorizing the Debtors to obtain the DIP Facility (including the fees payable to the DIP Agent in connection therewith); (b) authorizing the

Debtors to enter into the DIP Loan Documents; (c) authorizing the Debtors to use the DIP Facility, the proceeds thereof, and the Prepetition Collateral, including Cash Collateral; (d) granting Adequate Protection; (e) granting the DIP Liens and Superpriority Claims; (f) scheduling a Final Hearing to consider entry of the Final DIP Order and a deadline to file any objection to the Final DIP Order, and approving the form of notice with respect to the Final Hearing; and (g) granting related relief.

### Basis for Relief

**A.**  **The Debtors' Decision to Obtain the DIP Facility Should Be Approved as an Exercise of the Debtors' Sound Business Judgment.**

24.     Courts grant debtors in possession considerable deference in acting in accordance with their business judgment in obtaining post-petition secured credit, as long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

25.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Tech.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re*

*Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a Debtors' business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the Debtors'] authority under the [Bankruptcy] Code").

26.    Furthermore, in considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed post-petition facility.  For example, in *In re ION Media Networks. Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

27.    Here, the DIP Facility is clearly within the Debtors' reasonable business judgment.  The DIP Facility provides for reasonable economics, milestones and other case

management features, and its other terms are fair and reasonable.  The DIP Facility is the product

of arm's length, good faith negotiations between the Debtors, the DIP Agent, and the Prepetition

Secured Parties.  The Debtors have reason to believe that the proceeds of the DIP Facility and

their use in accordance with the Budget will be adequate to pay all administrative expenses due

and payable during the postpetition periods.  The Debtors also believe, for the reasons that

follow, that the DIP Facility meets the requirements for approval of post-petition financing on a

secured priming and superpriority basis.  Accordingly, entry into the DIP Facility is a sound

exercise of the Debtors' business, and should be approved.

### B. The DIP Facility Meets the Requirements to Authorize Post-Petition Financing on a Secured and Superpriority Basis under Section 364(c).

28.     The statutory requirement for obtaining post-petition credit under section 364(c)

is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit

allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  See *In re*

*Crouse Grp.*, *Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)

of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured

credit cannot be obtained).  To meet this requirement, a debtor need only demonstrate "by a good

faith effort that credit was not available without" the protections afforded to potential lenders by

sections 364(c) of the Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir.

1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding

that such credit is unavailable").

29.     Financing in an amount necessary to fund these Chapter 11 Cases is not

obtainable on an unsecured, *pari passu* or junior secured basis.  No potential third-party source

of financing for the Debtors, available on an expedited basis and on reasonable terms, would

agree to provide unsecured or junior secured financing in such amount in light of the secured

position of the Prepetition Secured Parties.  Moreover, any such potential source of financing, on secured terms, would require liens that prime those of the Prepetition Secured Parties.  The Prepetition Secured Parties have stated they do not consent to priming and would object to any such request.  A contested priming or adequate protection fight would like prove devastating to the Debtors' business and to the contemplated Section 363 Sale, subjecting the Debtors to a significant risk of being unfinanced or underfinanced for an extended period of time, especially in light of the Debtors' liquidity position as of the Petition Date.

30.    Courts have articulated a test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

     a.    the credit transaction is necessary to preserve the assets of the estate; and

     b.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. at 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

31.    The DIP Facility is necessary to preserve the Debtors' estates and their assets.  The Debtors have an immediate need for liquidity.  Before the Petition Date, the Debtors relied on protective overadvances from the Prepetition Lenders, and, after the Petition Date, the Debtors require the DIP Facility to continue providing funding for operations, working capital needs and to fund the Section 363 Sale.  The DIP Facility is also essential to provide the Debtors' employees, vendors and service providers, and other stakeholders the confidence in the Debtors' ability to continue operating while it pursues a Section 363 Sale.  Moreover, absent approval of the DIP Facility, the Debtors will almost certainly experience business disruptions, and the ability of the Debtors to conduct an orderly sale that maximizes the value of their estates would be irreparably harmed.

32.     The terms of the DIP Facility are fair, reasonable and adequate, in light of the circumstances of the Debtors and the DIP Lenders, who are affiliates of the Prepetition Secured Parties who provided the Debtors with their pre-petition financing.  The DIP Facility is the only viable source of financing for these cases.  Accordingly, the Debtors negotiated, at arm's length and in good faith, the best terms and conditions for DIP financing they could obtain from DIP Lenders.  The DIP Facility so obtained is sized to meet the reasonably anticipated operational costs and administrative expenses during the expected pendency of these Chapter 11 Cases as reflected in the Budget.  The economics, of the DIP Facility, including the interest rate and fees, reflect a fair, market exchange for the financing made available to the Debtors.  Similarly, the terms and conditions of the DIP Facility, including the case milestones, consensual priming DIP Liens, and certain other stipulations, waivers and case management features, are reasonable in light of the Debtors' and the objectives of these Chapter 11 Cases.  These economics, and terms and conditions, are also within the range of typical DIP facilities in the marketplace for chapter 11 debtors in similar business, and with similar size and finances, of the Debtors.

**C.      The DIP Facility Meets the Requirements to Authorize Post-Petition Financing on a Priming Basis under Section 364(d)(1).**

33.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> [A]uthorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>
> (A)  the [debtor] is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

34.     Here, the DIP Liens prime the liens of the Prepetition Secured Parties.  However, because the Prepetition Agent and the Prepetition Lenders, who are affiliates of the DIP Agent and DIP Lenders, have consented to this treatment, subject to approval of the adequate protection provisions described in the DIP Loan Documents, and because the DIP Agent and DIP Lenders have conditioned their willingness to provide the DIP Facility upon granting of the DIP Liens, the priming of the Prepetition Liens may be authorized under section 364(d)(1).

> **D.     The Debtors' Request to Use Cash Collateral and the Proposed Adequate Protection is Appropriate.**

35.     The Debtors' use of property of their estates, including Cash Collateral, is governed by section 363 of the Bankruptcy Code.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

36.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *14 (Bankr.

D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

37.    The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180—81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

38.    As set forth in the Interim DIP Order and other DIP Loan Documents, the Debtors propose to provide the Prepetition Secured Parties with Adequate Protection, including the Adequate Protection Liens, the Adequate Protection Super-priority Claims, and current cash payments to the Prepetition Secure Parties payable under the Prepetition Loan Documents for all professional fees and expenses in connection with the enforcement of the Prepetition Loan Documents and the Chapter 11 Cases.  Subject to the terms and conditions of the Interim DIP Order, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in exchange for the Adequate Protection.

39.    In addition to the Adequate Protection, the use of Cash Collateral in accordance with the terms of the Budget preserves and maximizes the value of the Prepetition Collateral. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (evaluating

"whether the value of the debtor's property will increase as a result of the" use of collateral in determining sufficiency of adequate protection); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor). Under the Budget, Cash Collateral will be used to pay operating expenses, and payroll for the Debtors' employees. In addition, the Budget provides for the expenses of administration of these Chapter 11 Cases, including to fund the Section 363 Sale. Payment of these and other expenses in accordance with the terms of the Budget is necessary to maintain the Debtors' enterprise as a going concern and thereby to maximizing the value of the Debtors' estates.

40.    In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate. Thus, the Debtors' proposed Adequate Protection is not only necessary to protect the Prepetition Secured Parties against any diminution in value, but is also fair and appropriate on an interim basis (and final basis, upon entry of the Final DIP Order) under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral in the near term, for the benefit of all parties in interest and their estates.

**E.    The DIP Lenders Should Be Deemed Good-Faith Lenders under Section 364(e).**

41.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur

> debt, or of a grant under this section of a priority or a lien, does not
> affect the validity of any debt so incurred, or any priority or lien so
> granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal.

42.    As set forth above, the DIP Facility is the result of the sound exercise of the

Debtors' business judgment, and the product of arm's length, good-faith negotiations between

the Debtors, the DIP Agent, DIP Lenders, and the Prepetition Secured Parties.  In addition, the

terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances,

and the proceeds of the DIP Facility will be used only for purposes that are permissible under the

Bankruptcy Code and are adequate to meet the Debtors' post-petition financing needs.

Accordingly, the Court should find that the DIP Agent and DIP Lenders are "good faith" entities

within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the

protections afforded by that section.

**F.    The DIP Lenders and Prepetition Lenders Should be Granted a Bankruptcy Code Section 506(c) Waiver and Waiver of the Equities of the Case Exception under Bankruptcy Code Section 552.**

43.    The DIP Loan Documents provide for a waiver of the any rights to charge costs

and expenses against the Prepetition Collateral or the DIP Collateral, upon entry of the Final DIP

Order. The Debtors request that the Court approve the waiver. Such waivers and provisions are

standard under financings between sophisticated parties, and is a condition to the DIP Agent and

DIP Lenders providing the DIP Facility to the Debtors. As one court noted, "the Trustee and

Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and

have made use of their rights against the Lender under § 506(c) by waiving them in exchange for

concessions to the estates (including a substantial carve-out for the benefit of administrative

creditors)." *In re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000). *See*

*also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); *In re Telesphere Communications, Inc.*, 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

44.     The waiver of surcharge rights is appropriate where, as here, the Prepetition Secured Parties, the DIP Agent and the DIP Lenders have agreed to the use of Cash Collateral and the proceeds of the DIP Loan, in accordance with the Budget, and have consented to the Carve-Out.  Similarly, the waiver of the equities of the case exception under section 552(b) of the Bankruptcy Code is appropriate under the circumstances here.  The equities of the case exception under section 552(b) of the Bankruptcy Code is, by definition, inapplicable to postpetition liens.

**G.     The Automatic Stay Should Be Modified on a Limited Basis.**

45.     The Debtors request that automatic stay imposed by section 362 be modified to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents, the Interim DIP Order and the Final DIP Order, as applicable.  Such and similar stay modifications are common-place and standard features of debtor-in-possession financing arrangements, and are reasonable and fair under the circumstances of these Chapter 11 Cases. *See, e.g.*, *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg, LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del, Feb. 8, 2010) (same).

**H.     Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

46.     Bankruptcy Rules 4001(b) and (c) provides that a final hearing on motion to use cash collateral pursuant to section 363 and to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on such motions and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a Debtors' estates.

47.     The Debtors also have an immediate need to receive advances contemplated by the DIP Facility to provide sufficient liquidity to maintain operations during the period between the Petition Date and the Final Hearing in order to continue to operate and pay administrative expenses.  Entry of the proposed Interim DIP Order will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to the estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

48.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court schedule, by not later than June 8, 2018, a date for the Final Hearing that is as soon as practicable, as required by the DIP Loan Agreement, and fixes the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

49.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Consent to Jurisdiction**

50.    Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

**Notice**

51.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware; (b) MidCap Financial Trust as (i) Prepetition Agent under the Prepetition Loan Agreement and (ii) DIP Agent; (c) the DIP Lenders; (d) creditors holding the twenty (20) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (e) the Office of the United States Attorney for the District of Delaware; (f) the Internal Revenue Service; and (g) any other party entitled to notice pursuant to Local Rule 9013-1(m)(iii).  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered with respect to the Motion in accordance with Local Rule 9013-1(m)(iv).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

52.    No prior Motion for the relief requested herein has been made to this or any other court.

**Conclusion**

WHEREFORE, the Debtors respectfully request that this Court enter an order granting the relief requested herein and granting the Debtors such other and further relief as is just and proper.

Dated:  June 5, 2018                          GREENBERG TRAURIG, LLP

                                              */s/ Dennis A. Meloro*
                                              Dennis A. Meloro (DE Bar No. 4435)
                                              The Nemours Building
                                              1007 North Orange Street, Suite 1200
                                              Wilmington, Delaware 19801
                                              Telephone: (302) 661-7000
                                              Facsimile:  (302) 661-7360
                                              Email: melorod@gtlaw.com

                                              -and-

                                              Paul J. Keenan Jr. (*admitted pro hac vice* pending)
                                              John R. Dodd (*admitted pro hac vice* pending)
                                              Greenberg Traurig, P.A.
                                              333 S.E. 2nd Avenue, Suite 4400
                                              Miami, FL 33131
                                              Telephone: (305) 579-0500
                                              Facsimile:  (305) 579-0717
                                              Email: keenanp@gtlaw.com
                                                      doddj@gtlaw.com

                                              -and-

                                              Sara A. Hoffman (*pro hac vice* pending)
                                              Greenberg Traurig, LLP
                                              The MetLife Building
                                              200 Park Avenue
                                              New York, NY 10166
                                              Telephone:  (212) 801-9200
                                              Facsimile:  (212) 801-6400
                                              Email:  hoffmans@gtlaw.com

                                              *Proposed Counsel for the Debtors*
                                              *and Debtors-in-Possession*