## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Sancilio Pharmaceuticals Company, Inc., *et al.*,[1] | Case No. 18-11333 (CSS) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BID PROCEDURES AND BID PROTECTIONS RELATING TO THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) ESTABLISHING PROCEDURES IN CONNECTION WITH THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) APPROVING NOTICE PROCEDURES, AND (D) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by this Motion (the "**Motion**") and pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seek entry of an order, substantially in the form annexed hereto as **Exhibit A** (the "**Bid Procedures Order**"): (a) approving the bid procedures and bid protections in the form annexed as **Exhibit 1** to the Bid Procedures Order (as amended or modified, the "**Bid Procedures**") to be implemented in connection with a sale (the "**Sale**") of all or substantially all of the Debtors' assets (the

---

[1] The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Sancilio Pharmaceuticals Company, Inc., 2129 N. Congress Avenue, Riviera Beach, FL 33404 (3353); Sancilio & Company, Inc., 2129 N. Congress Avenue, Riviera Beach, FL 33404 (7166); Blue Palm Advertising Agency, LLC, 2129 N. Congress Avenue, Riviera Beach, FL 33404 (n/a).

"**Assets**"); (b) establishing procedures in connection with the Debtors' assumption and assignment to the Successful Bidder or Backup Bidder (as such terms are defined below) of certain executory contracts and unexpired leases (each an "**Assigned Contract**" and, collectively, the "**Assigned Contracts**") and the allowance of corresponding cure amounts (the "**Cure Amounts**") to be paid in connection with such assumption and assignment; (c) approving the notice procedures (the "**Notice Procedures**") to advise parties in interest and Potential Bidders (as defined below) of the Bid Procedures, the auction of the Assets (the "**Auction**"), the sale hearing for the Assets (the "**Sale Hearing**"), and the Debtors' intent to assume and assign to the Successful Bidder or Backup Bidder the Assigned Contracts and the alleged amount of the corresponding Cure Amounts; and (d) granting related relief.  Additionally, the Debtors seek entry of an order (the "**Sale Order**"): (a) authorizing the Sale of the Assets free and clear of liens, claims, encumbrances and other interests, except as provided in a Purchase Agreement (as defined below); (b) approving the assumption and assignment of the Assigned Contracts; and (c) granting relief related relief.  In support of this Motion, the Debtors respectfully state as follows:

## Status of the Case

1.      On June 5, 2018 (the "**Petition Date**"), the Debtors commenced these cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

2.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these Chapter 11 Cases.

## Jurisdiction, Venue and Statutory Predicates

4.     The Bankruptcy Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

5.     The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014 and Local Rules 2002-1 and 6004-1.

## Background

6.     Sancilio is a private pharmaceutical development and manufacturing company. Its business is comprised of multiple business lines including:  (i) the development of proprietary prescription medicines using a unique and proprietary solubility enhancement technology called Advanced Lipid Technologies ("**ALT**") including Sancilio's lead product candidate under the ALT platform for the treatment of sickle cell disease in the pediatric population; (ii) over-the-counter and behind-the-counter omega-3 dietary supplements under the brand "Ocean Blue"; (iii) prenatal vitamins and dental health supplements that operate as "generics" dispensed at pharmacies; and (iv) third-party development and manufacturing services for other companies.

7.     In 2017, Sancilio began experiencing increasingly constrained access to additional capital and liquidity and, by late 2017, endured a liquidity crisis.  In early 2018, Sancilio secured an additional $5.5 million in equity capital to serve as bridge financing to pay overdue trade payables pending an expected sale of the company, but that transaction was not consummated. Accordingly, Sancilio began exploring its strategic alternatives including a further recapitalization, refinancing or sale.  Notwithstanding these efforts, Sancilio received no executable offer for recapitalization or refinancing.

8.      Since mid-April the Debtors' liquidity needs have been met from protective overadvances funded by their prepetition lenders.   Having no executable path to a recapitalization or refinancing, the Debtors' commenced these cases to preserve themselves as a going concern and to maximize the value of their estates.   The Debtors' objectives in these Chapter 11 Cases are to sell all or substantially all their assets pursuant to section 363 of the Bankruptcy Code in a flexible manner allowing for bids on all their assets, one or more of their business lines, or any combination thereof.

9.      A detailed factual background of the Debtors' business and operations, as well as the events precipitating the commencement of these Chapter 11 Cases, is more fully set forth in the Declaration of Geoffrey Glass in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.[2]

### Sale of the Assets

10.      As more fully set forth in the First Day Declaration, the Debtors' business is comprised of multiple business lines.   The objective in these Chapter 11 Cases is to sell the Debtors' Assets pursuant to section 363 of the Bankruptcy Code in a flexible manner allowing for bids on all their assets, one or more of their business lines, or any combination thereof.   To that end, before the Petition Date, the Debtors obtained two stalking horse bids.

### The MidCap Stalking Horse Bid

11.      The Debtors have entered into that certain Asset Purchase Agreement, dated as of June 5, 2018 (the "**MidCap Purchase Agreement**"), by and between the Debtors and MidCap Funding Trust XIII, or its designee, as stalking horse bidder (the "**MidCap Stalking Horse**

---

[2]   Unless otherwise stated, capitalized terms used but not defined in this Motion have the meaning ascribed to the in the First Day Declaration.

**Bidder**").  The MidCap Stalking Horse is an affiliate of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, and is a holder of approximately 1% of the Debtors' equity.  The MidCap Purchase Agreement provides for the purchase of substantially all of the Debtors' Assets, except the Assets related to the Ocean Blue Line of omega-3 fish oil supplements (as more fully set forth in KD Purchase Agreement (defined below)).  As more fully set forth therein, the MidCap Purchase Agreement provides for a credit bid in an amount not less than $15,000,000, with the amount of the credit bid to be fixed no later than two (2) Business Days after entry of the Bidding Procedures Order, subject to higher and better bids at the Auction (the "**MidCap Stalking Horse Bid**").  A credit bid in an amount less than the entire amount of the DIP Obligations and Prepetition Obligations is intended to increase interest in the Auction and attract competing bids.  A copy of the MidCap Purchase Agreement is attached hereto as **Exhibit B**.

### The KD Stalking Horse Bid

12.     The Debtors have also entered into an Asset Purchase Agreement, dated June 5, 2018 (the "**KD Purchase Agreement**"; together with the MidCap Purchase Agreement, the "**Purchase Agreements**", and each a "**Purchase Agreement**"), by and between the Debtors and K.D. Pharma Bexbach GmbH, or its designee, as stalking horse bidder (the "**KD Stalking Horse Bidder**"; together with the MidCap Stalking Horse, the "**Stalking Horse Bidders**", and each a "**Stalking Horse Bidder**").  The KD Stalking Horse Bidder is a holder of approximately 12% of the Debtors' equity.  Its Chief Executive Officer served on the Board of Directors of the Debtors before the Debtors' acceptance of the KD Stalking Horse Bid.  In addition, the KD Stalking Horse Bidder is a joint venture by which K.D. Pharma Bexbach GmbH is the majority investor with a minority investment being made by both John Licari and Anthony Valetutti, current

employees of the Debtors and managers relating to the Ocean Blue Line.  As more fully set forth therein, the KD Purchase Agreement provides the purchase of the Ocean Blue Line in exchange for cash consideration in the amount of $2,500,000, subject to higher and better offers at the Auction (the "**KD Stalking Horse Bid**"; together with the MidCap Stalking Horse Bid, the "**Stalking Horse Bids**").  A copy of the KD Purchase Agreement is attached hereto as **Exhibit C**.

**The Proposed Marketing, Auction and Sale**

13.    Now that the Debtors have obtained the Stalking Horse Bids they desire to conduct an in-court marketing process culminating in the Auction and Sale of the Assets.  The Debtors have retained, subject to the Court's approval, the investment banking services of Cassel, Salpeter & Co., LLC ("**Cassel Salpeter**"), to advise and assist the Debtors in marking the Assets and conducting the Auction and Sale.  Cassel Salpeter is an independent investment banking firm that assists middle-market and emerging growth companies across a broad spectrum of industries.  Cassel Salpeter has provided investment banking and other services in connection with the restructuring or sale of the following companies: NephroGenex, Inc. (Nasdaq:NRX), Dynavox, Inc. (OTCPK:DVOX.Q), Gulfstream International Airlines, Electrolytic Technologies Corporation, Brijot Millimeter Wave Technologies, Corp., HeathStar Communications, Inc., HC Innovations, Inc., Stant Corp., AFP Imaging Corp., Nailite International, Inc., OMI Medical Imaging, Nitram, Inc., and uniDigital, Inc.  Cassel Salpeter's professionals are also providing or have provided mergers and acquisitions advisory services in connection with whole or partial company sale transactions involving companies across a wide range of industries, including pharmaceuticals.  The Debtors propose the following schedule for

completing the marketing and sale process in these Chapter 11 Cases and conducting the Auction

and Sale pursuant to section 363:

| Event or Deadline | Date and Time |
|---|---|
| Bid Deadline (including for any credit bids) | **July 16, 2018 at 5 pm ET** (2 days before proposed auction date) |
| Deadline to Object to Sale | **July 13, 2018 at 4 pm ET** (4 Business Days before proposed July 19 Sale Hearing) |
| Contract Objection Deadline (for all objections other than adequate assurance) | **June 13, 2018 at 4 pm ET** (4 Business Days before proposed July 19 Sale Hearing) |
| Selection of Qualified Bidder | **July 17, 2018 at Noon** (one day before proposed auction date) |
| Auction | **July 18, 2018 at 10 am ET** (1 day before proposed July 19 Sale Hearing) |
| Deadline to File Notice Designating Successful Bidder | Immediately upon identifying and determine the Successful Bidder |
| Deadline to Object to Adequate Assurance of Future Performance and Raise Any Additional Cure Cost Objections | Up to the commencement of the Sale Hearing |
| Sale Hearing (subject to the Court's availability) | **July 19, 2018** at a time to be determined by the Bankruptcy Court |

14.    The Debtors and their financial advisors believe that this schedule for marketing

the Assets and conducting the Auction and Sale will fully test the market for the Assets.

## **Relief Requested**

15.    By this Motion, the Debtors seek entry of the Bid Procedures Order (a) approving

the Bid Procedures; (b) establishing procedures with respect to the assumption and assignment of

executory contracts and leases, (c) approving the proposed Notice Procedures; and (d) granting

related relief.  Further, the Debtors seek entry of the Sale Order (a) authorizing the sale of the

Assets free and clear of all liens, claims, encumbrances and other interests, except as provided in a Purchase Agreement; (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases; and (c) granting relief related relief.

**A.      The Bid Procedures**

16.      The Debtors' proposed Bid Procedures are intended to establish a sale process that will maximize the value of the Assets for the benefit of the Debtors' estates and their creditors.  The Debtors will solicit bids for the Assets in accordance with such Bid Procedures and, if Qualified Bids (as defined below) are received in conformance with the Bid Procedures, the Debtors will conduct the Auction to determine the highest or otherwise best bid for the Assets.  Specifically, the Bid Procedures provide, in relevant part, as follows:[3]

A.      <u>Qualified Bidders, Non-Disclosure Agreements and Access to Data Room.</u>

Any person or entity wishing to bid on the Assets must execute and deliver (unless previously delivered) to the Debtors a confidentiality and non-disclosure agreement (a "**Non-Disclosure Agreement**") in form and substance acceptable to the Debtors and, at the Debtors' request, provide financial information that demonstrates such person or entity's ability to submit a bid that complies with the requirements herein and the Bid Procedures Order (each a "**Potential Bidder**")

The Debtors, in their discretion, will afford a Potential Bidder due diligence access or such additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate, including, without limitation, access to the Debtors' confidential electronic data room, reasonable access, during normal business hours, to the Debtors' management, and access to all relevant information regarding the Assets reasonably necessary to enable a Potential Bidder to evaluate the proposed Sale; provided that any such Potential Bidder has delivered evidence to the Debtors of its financial wherewithal and ability to consummate the Sale, the adequacy of which will be assessed by the Debtors in their sole discretion.  Cassel Salpeter will coordinate all due diligence access and requests for additional information from such Potential Bidders.  The Debtors shall not be obligated to furnish any due diligence information after the conclusion of the

---

[3]  This description of the Bid Procedures includes excerpts from the terms set forth in the Bid Procedures annexed hereto.  Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bid Procedures.  To the extent that this description differs in any way from the terms set forth in the Bid Procedures, the terms of the Bid Procedures shall control.

Auction other than to the Successful Bidder(s) (defined below) or any Backup Bidder(s) (as defined below).  None of the Debtors, their counsel or their advisors are responsible for, or will bear liability with respect to, any information obtained by Potential Bidders in connection with due diligence.  Notwithstanding anything contained herein to the contrary, to the extent the Debtors believe that providing access to Potential Bidders to certain sensitive commercial information is not advisable, the Debtors, in their business judgment, will decide what, if any, diligence information to make available to a particular Potential Bidder, and neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever to any party.

A "**Qualified Bidder**" is any Potential Bidder that (a) delivers to the Debtors a Non-Disclosure Agreement, (b) demonstrates to the Debtors a reasonable certainty of the ability to close the Sale in a timely manner (including the (i) financial capability to close the Sale and provides adequate assurance of future performance to counterparties to contracts to be assumed and assigned to such Potential Bidder, and (ii) the ability to obtain necessary governmental, licensing, regulatory, or other approvals necessary for such Sale, if any), and (c) submits a Written Offer (as defined below) that is deemed a Qualified Bid as set forth below.  As promptly as practicable after a Potential Bidder delivers a Non-Disclosure Agreement and submits a Written Offer, and in any event not later than 12:00 p.m. (prevailing Eastern Time) one (1) day preceding the Auction, the Debtors shall determine, and the Debtors shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder.  Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate the proposed Sale.  Each of the Stalking Horse Bidders shall be deemed a Qualified Bidder who has submitted a Qualified Bid (as defined below).

B.      Requirements for a Qualified Bid.

In order to become a Qualified Bidder and participate in the Auction, if any, a Potential Bidder must deliver to the Debtors, with a copy to counsel to the Debtors and Cassel Salpeter, a written offer (each, a "**Written Offer**") that must meet each of the requirements listed below (each such bid, a "**Qualified Bid**"):

    i.   Delivery:  Be delivered no later than 5:00 p.m. (prevailing Eastern Time) on the Bid Deadline.

    ii.   Executed Agreement:  Be accompanied by (a) a clean asset purchase agreement, duly executed and delivered by such Qualified Bidder enforceable against such Qualified Bidder in accordance with its terms (together with the exhibits, a "**Bid Purchase Agreement**"); and (b) a marked Bid Purchase Agreement(s) reflecting any variations from the applicable Purchase Agreement(s), if any.

    iii.   Assumed Liabilities: Provide for the assumption of at least the same assumed liabilities as set forth in the applicable Purchase Agreement, to

the extent such Qualified Bid is for the Assets under the applicable Purchase Agreement.

iv. <u>Designation of Assigned Contracts and Leases and Adequate Assurance of Future Performance</u>:  Contain a list of any and all executory contracts or unexpired leases that are to be assumed and assigned in connection with a Sale.   The Potential Bidder must also include written documentation sufficient to demonstrate the Potential Bidder's ability to provide adequate assurance of future performance for the benefit of the non-Debtor parties to such executory contracts or unexpired leases on the list, including, without limitation, (a) the specific name of the entity to whom such executory contracts or unexpired leases will be assigned; (b) if available, audited financial statements and annual reports of the proposed assignee for the past three (3) years, including all supplements or amendments thereto, and, if not available, the latest unaudited financial statements and such other relevant financial information as may be requested from the Debtors, if any; (c) cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, all cash flow projections for the executory contracts or unexpired leases subject to the assignment request, and any financial projections, calculations and/or pro formas prepared in contemplation of purchasing the assets, including the contracts and leases; (d) all documents and other evidence of the proposed assignee's experience in the Debtors' industry; and (e) a contact person for the proposed assignee whom non-debtor parties may contact directly in connection with adequate assurance of future performance.   Should the Potential Bidder and/or proposed assignee be a newly formed entity (a "**Newco**"), written evidence of adequate assurance of future performance should also include when such Newco was formed, how it will be financed together with evidence of firm financial commitments, and identify what credit enhancements will be available to guarantee the obligations of the Newco under the executory contracts or unexpired leases to be assigned. Non-debtor parties to the executory contracts or unexpired leases proposed to be assumed and assigned will have until the commencement of the Sale Hearing to object on adequate assurance grounds.

v. <u>Proof of Financial Ability to Perform</u>:   Contain evidence of financing, access to funds or such other financial and other information that will reasonably allow the Debtors to make a determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Written Offer, which evidence is satisfactory to the Debtors, in timely consultation with the DIP Agent, including, without limitation, such financial and other information setting forth adequate assurance under section 365 of the Bankruptcy Code in a form requested by the Debtors.   In addition, with respect to any Newco, the bid must include current audited (if available) and the latest unaudited financial statements and/or such other relevant financial information as may be requested by the Debtor, including information regarding the major equity

holders or financial sponsors of such entity evidencing the Newco's ability to consummate the transactions contemplated by the Written Offer, which evidence must be satisfactory to the Debtors, in timely consultation with the DIP Agent.

vi.   Identification of Parties to Participate: To the Debtors' satisfaction, (a) fully disclose the identity of each entity or person that will be bidding for the Assets or otherwise participating in connection with such bid and such entity or person's relationship, affiliation or connection, if any, to the Debtors or the Stalking Horse Bidders, (b) the terms of any such participation, and if an entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such entity, and (c) the ability of such parties to obtain government, licensing or regulatory approval in connection with the consummation of any Sale.

vii.  Binding and Irrevocable:  State that the Written Offer is binding and irrevocable until (a) the closing of the Sale, if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Successful Bidder (as defined below), or (b) if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Backup Bidder (as defined below), until the earlier of (x) the date of closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid (as defined below) have been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and the Bid Procedures Order and (y) and ten (10) Business Days following the date the order approving the sale of the Purchased Assets to the Successful Bidder shall have become a become a final, non-appealable, order ("Final Order") (the "**Backup Bid Expiration Date**"); provided, that if such Successful Bidder shall fail to close on its purchase of the Assets prior to the Backup Bid Expiration Date, such Backup Bid shall continue to remain open and irrevocable, the Backup Bidder shall be deemed to be the Successful Bidder, and it shall close on the Sale within ten (10) Business Days of becoming the Successful Bidder.

viii. No Break-Up Fee or Expense Reimbursement:  Not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment; provided, however, that each Purchase Agreement with the applicable Stalking Horse Bidder shall contain a break-up fee and expense reimbursement, as approved in the Bid Procedures Order.

ix.   Authorization to Consummate Sale:  Provide evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if any, with respect to the submission, execution, delivery and closing of the Bid Purchase Agreement to the Debtors' satisfaction.

x. <u>Purchase Price</u>:  Provide that the purchase price shall be paid in full at the closing of the Sale in U.S. dollars and in cash.  Provide further:

1. If the Bid Purchase Agreement offers to buy the Assets set forth in the MidCap Purchase Agreement, then the Purchase Price must be equal to or more than:  (i) the Purchase Price stated in section 2.5 therein (less the "Cash Amount" referenced therein, if any), <u>plus</u> (ii) the sum of (x) a break-up fee equal to three percent (3%) of the Purchase Price (the "**MidCap Break-Up Fee**") and (y) an expense reimbursement up to $1,000,000 of actual, reasonable and documented expenses of the MidCap Stalking Horse Bidder (the "**MidCap Expense Reimbursement**"), <u>plus</u> (iii) a minimum overbid amount of $250,000, the sum of the foregoing (the "**MidCap Minimum Overbid Amount**"). Not later than two (2) Business Days following the entry of the Bidding Procedures Order, the MidCap Stalking Horse Bidder will confirm the then current dollar amount of the Purchase Price (excluding the Cash Amount), which shall not be less than $15,000,000, in writing to the Debtors, which amount shall be subject to adjustment.

2. If the Bid Purchase Agreement offers to buy the Assets set forth in the KD Purchase Agreement, then the Purchase Price must be equal to or more than:  (i) the Purchase Price stated in section 3.01 therein ($2,500,000), <u>plus</u> (ii) the sum of (x) a break-up fee in the amount of $75,000 (the "**KD Break-Up Fee**"; collectively with the MidCap Break-Up Fee, the "**Break-Up Fee**") and (y) an expense reimbursement up to $100,000 of the actual, reasonable and documented expenses of the KD Stalking Horse Bidder (the "**KD Expense Reimbursement**"; collectively, with the MidCap Expense Reimbursement, the "**Expense Reimbursement**"), <u>plus</u> (iii) a minimum overbid amount of $100,000, which in the aggregate is a minimum overbid amount of $2,775,000 (the "**KD Minimum Overbid Amount**").

3. If the Bid Purchase Agreement offers to buy all the Assets, then the Purchase Price must be equal to or more than sum of the MidCap Minimum Overbid Amount and the KD Minimum Overbid Amount.

4. If the Bid Purchase Agreement offers to buy another combination of the Assets, then the Debtors, in timely consultation with MidCap Funding XVIII Trust, as administrative agent (in such capacity, the "**DIP Agent**") under that certain Debtor in Possession Credit and Security Agreement, dated June 5, 2018 (the "**DIP Loan Agreement**"), shall determine whether the Purchase Price is a qualifying minimum overbid.

xi.  Good Faith Deposit:  Provide a good faith cash deposit (the "**Good Faith Deposit**") submitted via federal wire transfer in immediately available funds in accordance with the wire instructions to be provided by the Debtors, or such other form as is acceptable to the Debtors, in an amount equal to 10% of the cash purchase price set forth in the Written Offer. The Good Faith Deposit shall be held in a non-interest bearing escrow account to be identified and established by the Debtors.

xii.  Anticipated Timeline:  If applicable, set forth the anticipated timeframe for obtaining any required government, regulatory or other approvals within the requirements of subparagraph (xvii) below.

xiii.  Agreement with Bid Procedures and Provision of Additional Information: Include a written acknowledgement by such Potential Bidder that it (a) agrees to the terms of the Bid Procedures; and (b) agrees to provide such other information as may be reasonably requested in writing by the Debtors prior to the Auction.

xiv.  Transition Services.  Set forth whether the Potential Bidder will require transition services from the Debtors for the Assets and, if so, for what period of time and proposed economic terms.

xv.  No Financing, Approval or Diligence Outs. Include a written statement that the bid is not conditioned on obtaining any of the following:  (a) financing; (b) board of directors or other similar approval; or (c) the outcome or completion of a due diligence review by the Potential Bidder. The presence of any governmental, licensing, regulatory or other approvals or consents in a bid or other contingencies, and the anticipated timing or likelihood of obtaining such approvals or consents or resolving such contingencies, may be grounds for the Debtors, in timely consultation with the DIP Agent, to determine that such bid (i) is not a Qualified Bid or (ii) is not higher or otherwise better than any other Qualified Bid.

xvi.  Consent to Jurisdiction.  The Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' and consent to the entry of a final order or judgment in any matter related to qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, and the Sale documents and the Closing, as applicable.

xvii.  Closing Date:  As promptly as possible, but in no event later than twelve (12) Business Days after entry of the Sale Order or the outside date for closing in the respective Purchase Agreements.

Between the Bid Deadline and the Auction, the Debtors may (i) negotiate or seek clarification of any Qualified Bid from a Qualified Bidder, (ii) request information from

the Qualified Bidder, (iii) engage in discussions with the Qualified Bidder, or (iv) take such other actions contemplated under these Bid Procedures. Without the consent of the Debtors, a Qualified Bidder may not amend, modify or withdraw its Written Offer. Any Good Faith Deposit accompanying a Written Offer that the Debtors determine not to be a Qualified Bid shall be returned promptly following such determination.

The Debtors may (and, at the request of the DIP Agent, shall) request additional information from a Potential Bidder or Qualified Bidder at any time prior to the Auction in order to evaluate such bidder's ability to bid at the Auction over and above its initial offer in its Qualified Bid, consummate the Sale, and fulfill its obligations in connection therewith. Each Potential Bidder or Qualified Bidder shall be obligated to provide such additional information within two (2) Business Days of receiving such requests as a condition to participating further in the Auction and Sale processes; provided, however, that additional information requests made by the Debtors during the Auction, of in the two (2) Business Day period before the Auction, in connection with a Qualified Bidder's ability to continue to bid at the Auction over and above its initial offer in its Qualified Bid shall be satisfied prior to such Qualified Bidder submitting any further bids at the Auction. The Debtors shall determine in their sole discretion whether a Potential Bidder or Qualified Bidder has complied with such request. The failure to comply with such requests shall disqualify such Potential Bidder or Qualified Bidder.

C.    Bid Deadline.

All Qualified Bids must be received by each of the parties listed below prior to the Bid Deadline.

|  |  |
|---|---|
| Debtors: | Geoffrey Glass |
|  | Sancilio Pharmaceuticals Company, Inc. |
|  | 2129 N. Congress Avenue |
|  | Riviera Beach, FL 33404 |
|  | email: gglass@sancilio.com |
|  |  |
| Debtors' Counsel: | Paul J. Keenan Jr. |
|  | Greenberg Traurig, LLP |
|  | 333 S.E. 2nd Avenue |
|  | Suite 4400 |
|  | Miami, Florida 33131 |
|  | e-mail: keenanp@gtlaw.com |
|  |  |
| Debtors' Investment Banker | Cassel Salpeter & Co. |
|  | 801 Brickell Avenue |
|  | Suite 1900 |
|  | Miami, Florida 33131 |
|  | Attn: James S. Cassel |
|  | e-mail: jcassel@cs-ib.com |

The Debtors will promptly (but, in any case, within one (1) calendar day) deliver, after receipt thereof, copies of all Written Offers to counsel for the DIP Agent; provided that Written Offers received on the Bid Deadline shall be delivered to the DIP Agent on such date.

D.      Determination of Qualified Bidders.

The Debtors, after timely consultation with the DIP Agent, shall, by no later than 12:00 p.m. (prevailing Eastern Time) one (1) day prior to the Auction, (i) determine, in their business judgment, whether a Potential Bidder is a Qualified Bidder, (ii) notify each such Potential Bidder that its Written Offer is a Qualified Bid and that such Potential Bidder is a Qualified Bidder; and (iii) provide a copy of the Opening Qualified Bid (defined below) to each Qualified Bidder.

E.      "As Is, Where Is".

Except as otherwise provided in the Final Purchase Agreement (as defined below), the Sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors or their estates except to the extent set forth in the Final Purchase Agreement as approved by the Bankruptcy Court.  Except as otherwise provided in the Final Purchase Agreement, all of the Debtor's right, title and interest in and to the Assets shall be sold free and clear of all liens, claims, interests and encumbrances (collectively, the "**Interests**") in accordance with sections 363 and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the Sale of the Assets.

Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all desired due diligence regarding the Assets prior to making its Qualified Bid, that it has relied solely upon its own independent review, investigation and inspection of any documents and/or the Assets in making its Qualified Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Procedures or, as to the Successful Bidder(s) and the Backup Bidder(s), the terms of the Sale(s) as set forth in the final form of the applicable Bid Purchase Agreement(s) (the "**Final Purchase Agreement**") which shall be on terms mutually acceptable to the Successful Bidder(s) and Backup Bidder(s), on the one hand, and the Debtors, on the other hand.

F.      Auction.

If the Debtors have determined that there are one or more Qualified Bidders in addition to the Stalking Horse Bidders, the Debtors shall conduct an Auction to determine the highest and otherwise best Qualified Bid.  This determination shall take into account any factors the Debtors, in their business judgment, after timely consultation with the DIP Agent, reasonably deem relevant and may include, among other things, the following:  (i) the amount and nature of the consideration; (ii) the number, type and nature of any

changes to the Purchase Agreement requested by a Qualified Bidder in its respective Bid Purchase Agreement; (iii) the extent to which such modifications are likely to delay closing of the Sale of the Assets and the cost to the Debtors of such modifications or delay; (iv) the total consideration to be received by the Debtors; and (v) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof.

The Auction shall commence at 10:00 a.m. (prevailing Eastern Time) on July [18], 2018, at the offices of Greenberg Traurig, LLP, MetLife Building, 200 Park Avenue, New York, New York 10166, or such other place as determined by the Debtors, in timely consultation with the DIP Agent, and continue thereafter until completed. The Debtors, after timely consultation with the DIP Agent, reserve the right to cancel or postpone the Auction.

Except as otherwise permitted in the Debtors' discretion, only the Debtors, the DIP Agent and DIP lenders, the Qualified Bidders, and any creditor or landlord that submits a written request to attend to the Debtors in advance of the Auction, and, in each case, their respective professionals shall be entitled to attend the Auction. Only a Qualified Bidder is eligible to participate in the Auction.

The Auction shall be governed by the following procedures:

i. Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

ii. The Debtors, after consultation with the DIP Agent, may waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bid Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, or any order of the Bankruptcy Court entered in connection with these Chapter 11 Cases, (ii) disclosed to each Qualified Bidder, and (iii) designed, in the Debtors' business judgment, to result in the highest and otherwise best offer for the Assets.

iii. The Debtors will arrange for the actual bidding at the Auction to be transcribed. Each Qualified Bidder shall designate a single individual to be its spokesperson during the Auction.

iv. Each Qualified Bidder participating in the Auction must confirm on the record, at the commencement of the Auction and again at the conclusion of the Auction that it has not engaged in any collusion with the Debtors or any other Qualified Bidder regarding these Bid Procedures, the Auction or any proposed transaction relating to the Assets.

v. Prior to the Auction, which shall be conducted in two stages, the Debtors shall identify the highest and best of the Qualified Bids received (the "**Opening Qualified Bid**"). The Assets subject to the KD Purchase

Agreement shall be offered for Auction first followed by the Assets subject to the MidCap Purchase Agreement. The first overbid at the Auction shall be the amount of the Opening Qualified Bid for such Assets plus $250,000. Thereafter, a Qualified Bidder may increase its Qualified Bid in any amount as long as each subsequent bid (each, a "**Subsequent Overbid**") exceeds the previous highest bid by at least $250,000 of additional cash consideration.

vi.   As set forth in Section 4 above, Qualified Bidders shall provide evidence of its financial wherewithal and ability to consummate the Sale at the increased Purchase Price presented during the Auction. Each bid made by a Qualified Bidder at the Auction must continue to meet, satisfy or comply with the requirements of a Qualified Bid, other than those applicable to the submission of an initial Qualified Bid.

vii.  Other than the assumption of liabilities of the Debtors, all bids must be in cash.

viii. If a Stalking Horse Bidder bids at the Auction, it shall be entitled to a "credit bid" in the amount of the Break-Up Fee and Expense Reimbursement to be counted towards its bid, and, at its sole option, the MidCap Stalking Horse Bidder shall be entitled to reduce the amount of its credit bid in an amount equal to the final cash purchase price accepted by the Debtors at the Auction from the Successful Bidder for the assets subject to the KD Purchase Agreement; provided, however, neither MidCap Financial Trust, as agent on behalf of the Debtors' prepetition secured lenders, or the MidCap Stalking Horse Bidder, in its capacity as DIP Agent on behalf of the lenders under the DIP Loan Agreement, may "credit bid" with respect to those Assets set forth in the KD Purchase Agreement.

ix.   The Auction will continue with each Qualified Bidder submitting additional Subsequent Overbids in each round of bidding, after being advised of the terms of the then highest bid and the identity of the Qualified Bidder who made such bid, in each round of bidding. Each Qualified Bidder must bid in each round or it shall be disqualified from further bidding at the Auction. All Qualified Bidders shall have the right to, at any time, request that the Debtors use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then-current highest and best bid.

x.    All Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Purchase Agreement or Bid Purchase Agreement, as applicable, at the Auction in accordance with the terms and provisions of these Bid Procedures, *provided*, *however*, that any such modifications to the Purchase Agreement or Bid Purchase Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the

Debtors as determined by the Debtors, in their business judgment, after timely consultation with the DIP Agent.

xi.     Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable, after timely consultation with the DIP Agent, (a) identify and determine in their business judgment the highest and best Qualified Bid for the Assets (a "**Successful Bid**" and the entity or entities submitting such Successful Bid, the "**Successful Bidder**"), (b) advise the Qualified Bidders of such determination, (c) require the Successful Bidder(s) to deliver an executed Final Purchase Agreement, which reflects its bid and any other modifications submitted and agreed to during the Auction, and (d) file the Supplement (as defined below).  In addition, the Debtors will determine, after timely consultation with the DIP Agent, which Qualified Bid, if any, is the next highest and best Qualified Bid to the Successful Bid, and will designate such Qualified Bid as a "**Backup Bid**" in the event the Successful Bidder fails to consummate the contemplated Sale.  A Qualified Bidder who submitted a Qualified Bid and is designated a Backup Bid is a "**Backup Bidder**".  Each Backup Bid shall remain open and binding until the Backup Bid Expiration Date.

xii.    Following the Auction, the Debtors will promptly file with the Bankruptcy Court a supplement (the "Supplement") that will inform the Bankruptcy Court of the results of the Auction. The Supplement will identify, among other things, (a) the Successful Bidder, (b) the amount and form of consideration to be paid by the Successful Bidder, (c) the assumed liabilities to be assumed by the Successful Bidder, if any, (d) the executory contracts to be assumed by the Debtors and assigned to the Successful Bidder, or the Debtor's rights and interests therein sold and transferred to the Successful Bidder, as the case may be, in connection with the Sale, and (e) the executory contracts designated by the Successful Bidder to be rejected by the Debtors in connection with the Sale.  The Supplement will also include similar information relating to the Backup Bidder and the Backup Bid.  In addition, the Debtors will attach to the Supplement (i) any revised proposed order approving the Sale to the Successful Bidder, (ii) a copy of the Final Purchase Agreement entered into by the Debtors and the Successful Bidder following the Auction, and (iii) any additional information or documentation relevant to the Successful Bid. The Debtors will file the Supplement on the docket for the chapter 11 cases as promptly as is reasonably practicable prior to the Sale Hearing, but will not be required to serve the same on any parties-in-interest in the chapter 11 cases.

G.      Sole Qualified Bidder.

If, by the Bid Deadline, there are no Qualified Bidders other than the Stalking Horse Bidders, (i) the Debtors shall not hold an Auction, (ii) the bids represented by the

Purchase Agreements shall be deemed the Successful Bids and the Stalking Horse Bidders shall be deemed the Successful Bidders and (iii) the Debtors shall request at the Sale Hearing that the Bankruptcy Court approve each Purchase Agreement from the respective Stalking Horse Bidder.

H.    Sale Hearing.

The Sale Hearing will be held before the Honorable Christopher S. Sontchi on [●], 2018 at [● am/pm] (prevailing Eastern time), subject to the Court's availability, at the United States Bankruptcy Court for the District of Delaware, located in Courtroom No. 6, 5th Floor, 824 Market Street, Wilmington, Delaware 19801.  At the Sale Hearing, the Debtors shall present the results of the Auction, if one is held, to the Bankruptcy Court and seek approval of the Successful Bid(s) and any Backup Bid(s).

Following the Sale Hearing and entry of a Sale Order approving the Sale of the Assets to a Successful Bidder, if such Successful Bidder fails to consummate the Sale for any reason, the Backup Bidder shall be designated the Successful Bidder and the Debtors shall be authorized to close such Sale with the Backup Bidder without further order of the Bankruptcy Court; *provided, however*, counterparties to any executory contracts or unexpired leases for which a Backup Bidder is deemed the new Successful Bidder shall receive written notice of the identity of the Backup Bidder being deemed the Successful Bidder, and shall have seven (7) days to object to the Backup Bidder's adequate assurance of future performance under any Lease to be assumed and assigned, with the Court to hold a subsequent hearing to determine any unresolved objections.   The Successful Bidder(s) and Backup Bidder(s) (if any) should be represented by counsel at the Sale Hearing.

I.    Consummation of the Purchase.

Closing Date; Good Faith Deposit

The Successful Bidder(s) shall consummate the Sale(s) contemplated by the Successful Bid(s) (the "**Purchase**") on or before the Closing Date.  If the Successful Bidder(s) successfully consummates the Purchase by the Closing Date, such Successful Bidder's Good Faith Deposit shall be applied to the purchase price of the Purchase.

If the Successful Bidder(s) either:  fails to consummate the Purchase on or before the Closing Date, breaches the Final Purchase Agreement, or otherwise fails to perform, the Debtors shall, without further order of the Bankruptcy Court, deem such Successful Bidder to be a "**Defaulting Buyer**".

The Debtors shall be entitled to retain the Good Faith Deposit as their sole and exclusive remedy resulting from the breach or failure to perform by a Defaulting Buyer in accordance with the terms of the Defaulting Buyer's Purchase Agreement.

Backup Purchaser.

Upon a determination by the Debtors that a Successful Bidder is a Defaulting Buyer, the Debtors shall consummate a Sale with the Backup Bidder on the terms and conditions of the Backup Bid (the "**Backup Purchase**") without further order of the Bankruptcy Court.

If the Backup Bidder consummates the Backup Purchase, the Good Faith Deposit of such Backup Bidder will be applied to the purchase price of the Backup Purchase.  In the event that the Debtors seek to consummate the Backup Purchase with the Backup Bidder and such Backup Bidder fails to consummate the Backup Purchase, breaches the Final Purchase Agreement or otherwise fails to perform, the Debtors may, in their discretion, and without further order of the Bankruptcy Court, deem such Backup Bidder to be a Defaulting Buyer and shall be entitled to (i) retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Defaulting Buyer, and (ii) seek all available damages from such Defaulting Buyer occurring as a result of such Defaulting Buyer's failure to perform in accordance with the terms of the Purchase Agreement or Bid Purchase Agreement, as applicable.

J.     Return of Good Faith Deposits.

Good Faith Deposits of all Qualified Bidders consisting of cash shall be held in a non-interest bearing escrow account.  Except for those of the Successful Bidder(s) and Backup Bidder(s), the Debtors shall promptly return the Good Faith Deposits of (i) all Qualified Bidders within two (2) Business Days after conclusion of the Auction; and (ii) the Backup Bidder after the Backup Bid Expiration Date.

**B.     Assumption and Assignment/Cure Procedures**

17.     To facilitate and effectuate the Sale, the Debtors may be required to assume and assign certain contracts and leases (the "**Assigned Contracts**") to the Successful Bidder or Backup Bidder, as applicable.  Given the number of executory contracts to which the Debtors are a party, the Debtors seek to establish (a) procedures for determining Cure Amounts through the closing date of the Sale, which amounts shall include all pre- and post-petition amounts the Debtors owe the non-debtor party under each Assigned Contract that have accrued and not been paid prior to the closing date, and (b) a deadline for any other objections to the assumption and assignment of the Assigned Contracts, including, without limitation, adequate assurance of future performance (collectively, the "**Cure Procedures**").

18.     No later than three (3) Business Days after entry of the Bid Procedures Order, the Debtors shall prepare and distribute to non-Debtor parties to the Assigned Contracts a notice, substantially in the form annexed to the Bidding Procedures Order as **Exhibit 3** (the "**Notice of Assignment and Assumption**"), listing (i) the Assigned Contract(s); and (ii) the Cure Amount(s), if any.

19.     To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assigned Contracts, the Debtors propose the following deadlines and procedures:

a.   The non-Debtor parties to the Assigned Contracts shall have until **4:00 p.m. (prevailing Eastern Time) on July 13, 2018** (the "**Contract Objection Deadline**"), which deadline may be extended in the discretion of the Debtors, to object (a "**Contract Objection**") to (i) the Cure Amounts listed by the Debtors and to propose alternative Cure Amounts, and/or (ii) the proposed assumption and assignment of the Assigned Contracts in connection with the Sale.  The Debtors may amend the Notice of Assignment and Assumption (each a "**Supplemental Notice of Assignment and Assumption**") to add or remove a contract or lease or to reduce the Cure Amount thereof.

b.   The non-Debtor parties to the Assigned Contracts shall have until the commencement of the Sale Hearing to raise any objections to the adequate assurance of future performance by the Successful Bidder (the "**Adequate Assurance Objection**").

c.   Any party objecting to (i) any Cure Amount and/or (ii) the proposed assumption and assignment of any Assigned Contract in connection with the Sale, shall file and serve a Contract Objection, in writing, setting forth with specificity, any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assigned Contract(s), as applicable, and/or any and all objections to the potential assumption and assignment of such agreements, together with all documentation supporting such claim or objection, upon counsel to the Debtors, so that the Contract Objection is received no later than **4:00 p.m. (prevailing Eastern Time), on the Contract Objection Deadline; provided that any Adequate Assurance Objection may be made at the Sale Hearing**.  Where a non-Debtor counterparty to an Assigned Contract files an objection asserting a cure amount higher than the proposed Cure Amount (the "**Disputed Cure Amount**"), then (a) to the extent the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the written consent of the Successful Bidder or Backup Bidder, as applicable, of such

consensual resolution, the Cure Amount shall be revised to be the amount of the consensual resolution; (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or such other date as agreed to by the parties; or (c) the Successful Bidder or Backup Bidder, as applicable, may remove the contract to which the Contract Objection relates from the schedule of Assigned Contracts.

d. Unless a Contract Objection is filed and served before the Contract Objection Deadline or, with respect to any Adequate Assurance Objection, raised at the Sale Hearing, all counterparties to the Assigned Contracts shall be (i) forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assigned Contracts, or any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the closing of the Sale, including those constituting Excluded Liabilities, against the Purchaser, any counterclaim, defense, setoff, recoupment, claim of refund or any other claim asserted or against the Debtors, and the Debtors and the Successful Bidder or Backup Bidder, as applicable, shall be entitled to rely solely upon the proposed Cure Amounts set forth in the applicable Notice of Assignment and Assumption; (ii) deemed to have consented to the assumption and assignment; and (iii) forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder or Backup Bidder, as applicable, that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assigned Contracts, including, without limitation, any consent rights, or that there is any objection or defense to the assumption and assignment of such Assigned Contracts or imposing or charging against the Successful Bidder or Backup Bidder, as applicable, any rent accelerations, assignment fees, increases or any other fees as a result of the Debtors' assumption and assignment to the Successful Bidder or Backup Bidder, as applicable, of any Assigned Contract in accordance with the Final Purchase Agreement.

e. To the extent a non-Debtor party believes that an Assigned Contract requires such party's consent right to the assignment of such Assigned Contract to the Successful Bidder or Backup Bidder, as applicable, such non-Debtor party must raise this issue in its objection which must be filed before the Contract Objection Deadline.  If no timely objection is raised, such other non-Debtor parties to an Assigned Contract shall be barred and estopped from asserting or claiming that their Assigned Contract contains an enforceable consent right.

**C.      Notice Procedures**

20.      The Debtors request that the Court approve the following Notice Procedures in connection with providing all parties in interest and Potential Bidders with notice of the Bid Procedures, the Auction Date, the Sale Hearing, and the Debtors' intent to assume and assign to

the Successful Bidder or Backup Bidder the Assigned Contracts and the corresponding Cure

Amounts as follows:

a.   On or before three (3) Business Days after entry of the Bid Procedures Order, or as soon thereafter as such parties can be identified, the Debtors will cause (a) a notice in substantially the form annexed as **Exhibit 2** to the Bid Procedures Order (the "**Notice of Bid Procedures, Auction Date and Sale Hearing**"); and (b) a copy of the Bid Procedures Order to be sent by first-class mail postage prepaid, to the following:  (i) the Office of the United States Trustee; (ii) counsel to the DIP Lender and the First Lien Agent; (iii) counsel to the Second Lien Agent, (iv) all taxing authorities in the states where the Debtors are located, including the Internal Revenue Service, and all other federal, state and local taxing and regulatory authorities known to the Debtors to assert jurisdiction over the Debtors or which are reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the ownership of the Assets, or to have any known interest in the relief requested by the Motion; (v) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (vi) all persons known or reasonably believed by the Debtors to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any of the Assets; (vii) the non-Debtor parties to the Assigned Contracts; (viii) all persons known or reasonably believed to have expressed an interest in acquiring the Assets within the last four (4) months; (ix) the United States Attorney's office; (x) Attorneys General in the states where the Debtors are located; (xi) any applicable state and local environmental agencies; (xii) the United States Bureau of Land Management; (xiii) the Colorado State Land Board; and (xiv) all parties to any litigation involving the Debtors.

b.   On or before three (3) Business Days after entry of the Bid Procedures Order, the Debtors will serve the Notice of Bid Procedures, Auction Date and Sale Hearing on all known creditors of the Debtors.

c.   On or before seven (7) days after entry of the Bid Procedures Order, subject to applicable submission deadlines, the Debtors will publish an abbreviated version of the Notice of Bid Procedures, Auction Date and Sale Hearing once in one or more regional and/or national publications that the Debtors deem appropriate.

d.   On or before three (3) Business Days after the entry of the Bid Procedures Order, the Debtors shall serve by first class mail or hand delivery, the Notice of Assumption and Assignment, substantially in the form attached to the Bid Procedures Order as **Exhibit 3**, on all non-Debtor parties to the Assigned Contracts.  The Notice of Assumption and Assignment (or a Supplemental Notice of Assumption and Assignment) shall (i) identify the calculation of the Cure Amounts that the Debtors believe must be paid to cure all prepetition defaults under the Assigned Contracts, and (ii) provide instructions for the timing and procedure governing the filing of any objections to (a) the proposed Cure Amounts and (b) the proposed assumption and assignment of any Assigned

Contract in connection with the Sale, as approved by the Bankruptcy Court in the Bid Procedures Order. In addition, if the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to the Successful Bidder or Backup Bidder, as applicable, that are not included in the original Notice of Assumption and Assignment, the Debtors shall promptly send a Supplemental Notice of Assumption and Assignment to the applicable counterparties to such additional Assigned Contracts.

21.    In addition to the foregoing, electronic notification of the Motion, the Bid Procedures Order, the Notice of Bid Procedures, Auction Date and Sale Hearing, and the Notice of Assumption and Assignment will be posted on: (i) the main case docket on the Bankruptcy Court's electronic case filing (ECF) website; and (ii) the case management website maintained by the Debtors' claims and noticing agent, JND Corporate Restructuring, at http://www.jndla.com/cases/sancilio.

D.    **The Proposed Sale**

22.    The Debtors also seek authority to sell the Assets to the Successful Bidder or Backup Bidder, as appropriate. Pursuant to Local Rule 6004-1(iv), the Debtors highlight the following terms contained the Purchase Agreements, which sets forth the Stalking Horse Bids and serve as the baseline form for any Qualified Bids, as follows:

i.    *Summary of MidCap Purchase Agreement*[4]

| MidCap Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L.R. 6004-1(b)(iv)<br><br>Purchase Price | The purchase price for the Purchased Assets (the "Purchase Price") shall be equal to the sum of: (a) a credit bid by the Purchaser or its designee of up to the full amount of the DIP Obligations; (b) a credit bid by the Purchaser or its designee of up to the full amount of the Prepetition Obligations; (c) an amount necessary to satisfy the Assumed Liabilities (whether at Closing or thereafter in accordance with the provisions of this Agreement); and (d) cash, if any, in the amount of the |

---

[4]  To the extent there is a conflict or discrepancy between this summary and the MidCap Purchase Agreement, the MidCap Purchase Agreement shall govern in all respects. Capitalized terms used in the summary have the meanings ascribed to them in the MidCap Purchase Agreement. All references to "Purchase Agreement §" refer to sections of the MidCap Purchase Agreement.

| MidCap Purchase Agreement Provision | Summary Description |
|---|---|
| | difference between the sum of the consideration in clauses (a), (b) and (c) of this Section 2.5 and the Purchaser's last bid submitted at, and accepted by, the Sellers at the Auction, if any (the "Cash Amount").  Not later than two (2) Business Days following the entry of the Bidding Procedures Order, the Purchaser will confirm the then current dollar amount of the Purchase Price (excluding the Cash Amount), which shall not be less than $15,000,000, in writing to the Sellers, which amount shall be subject to adjustment.<br><br>Purchase Agreement § 2.5. |
| Del. Bankr. L.R. 6004-1(b)(iv)<br><br>Material Term: Assumed Liabilities | In accordance with the provisions of this Agreement and the Sale Order, at the Closing, the Purchaser will assume and pay or perform and discharge when due only the following Liabilities of the Sellers, in each case other than the Excluded Liabilities, and no other Liabilities<br><br>Purchase Agreement § 2.3. |
| Del. Bankr. L.R. 6004-1(b)(iv)(A)<br><br>Sale to Insider | Not applicable |
| Del. Bankr. L.R. 6004-1(b)(iv)(B)<br><br>Agreements with Management | Not applicable except that the DIP Agent has agreed, subject to approval by the Bankruptcy Court, to certain key employee incentive and key employee retention programs. |
| Del. Bankr. L.R. 6004-1(b)(iv)(C)<br><br>Releases | Not at this time |
| Del. Bankr. L.R. 6004-1(b)(iv)(D)<br><br>Private Sale / No Competitive Bidding | Not applicable |
| Del. Bankr. L.R. 6004-1(b)(iv)(E) | The Purchase Agreement provides for the following milestones: |

| MidCap Purchase Agreement Provision | Summary Description |
|---|---|
| Closing and Other Deadlines | • as promptly as possible, but in no event later than three (3) Business Days after the Petition Date, the Sellers shall cause the Bankruptcy Court to enter the Interim DIP Order;<br>• as promptly as possible, but in no event later than twenty-five (25) days after the Petition Date, the Sellers shall cause the Bankruptcy Court to enter the Bidding Procedures Order, which shall, among other things, require that the bid deadline for competing bids be scheduled for not later than twenty-five (25) days after entry of the Bidding Procedures Order;<br>• as promptly as possible, but in no event later than two (2) Business Days after the Petition Date, the Sellers shall file a motion in form and substance reasonably acceptable to the Purchaser seeking entry of the Bidding Procedures Order;<br>• as promptly as possible, but in no event later than one (1) Business Day after entry of the Bidding Procedures Order, the Sellers shall forward so-called "bid packages" to potential bidders, subject to the terms and conditions contained in the Bidding Procedures Order, including, without limitation, potential bidders being qualified and executing a reasonably acceptable confidentiality agreement;<br>• as promptly as possible, but in no event later than twenty-one (21) days after the Petition Date, the Sellers shall cause the Bankruptcy Court to enter the Final DIP Order;<br>• as promptly as possible, but in no event later than five (5) Business Days after completion of the Auction, the Sellers shall cause the Bankruptcy Court to enter the Sale<br>• Order;<br>• as promptly as possible, but in no event later than twelve (12) Business Days after entry of the Sale Order, the Sellers shall consummate the Closing, which in no event<br>• shall occur later than August 31, 2018<br><br>Purchase Agreement § 5.10. |
| Del. Bankr. L.R. 6004-1(b)(iv)(F) | None |

| MidCap Purchase Agreement Provision | Summary Description |
|---|---|
| Good Faith Deposit | |
| Del. Bankr. L.R. 6004-1(b)(iv)(G) Interim Arrangements with Proposed Buyer | None |
| Del. Bankr. L.R. 6004-1(b)(iv)(H) Use of Proceeds | The cash proceeds of the Sale, if any, with any liens, claims, interests and encumbrances to attach to such proceeds to same extent, validity and priority as existed prior to the Petition Date, subject to the Carve Outs, will be paid to any creditors in accordance with the priorities of their allowed claims, upon further authorization from this Court as may be necessary or appropriate. |
| Del. Bankr. L.R. 6004-1(b)(iv)(I) Tax Exemption | None |
| Del. Bankr. L.R. 6004-1(b)(iv)(J) Record Retention | For a period equal to the lesser of: (i) eighteen (18) months after the Closing Date; and (ii) the closing of the Chapter 11 Cases by the Bankruptcy Court, the Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records in its possession that are Purchased Assets (including any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations) relating to the operation of Business and the Purchased Assets prior to the Closing Date. Purchase Agreement § 10.14(a). |
| Del. Bankr. L.R. 6004-1(b)(iv)(K) Sale of Avoidance Actions | All claims, rights, credits, causes of action, defenses and rights of set-off against Third Parties, including any commercial tort claims and unliquidated rights under manufacturers' and vendors' warranties and any Chapter 5 Action and Claim related to the Purchased Assets, including the Assumed Contracts and Receivables being purchased. Purchase Agreement § 2.1(j). |
| Del. Bankr. L.R. 6004- | The MidCap Purchase Agreement provides for a "Sale Order" |

| MidCap Purchase Agreement Provision | Summary Description |
|---|---|
| 1(b)(iv)(L) <br><br> Successor Liability Findings | that finds and concludes, among other things, that the Purchaser will not be subject to successor liability for any claims or causes of action of any kind or character against any Seller, whether known or unknown, unless expressly assumed as an Assumed Liability. <br><br> Purchase Agreement, definition of "Sale Order". |
| Del. Bankr. L.R. 6004-1(b)(iv)(M) <br><br> Free-and-Clear Sale of Unexpired Leases | Not applicable |
| Del. Bankr. L.R. 6004-1(b)(iv)(N) <br><br> Credit Bid | The MidCap Purchase Agreement provides for a credit bid as set forth in section 2.5 thereof. |
| Del. Bankr. L.R. 6004-1(b)(iv)(O) <br><br> Rule 6004(h) Relief | The MidCap Purchase Agreement provides for a "Sale Order" that permits the Purchaser to waive, in its sole discretion, the 14-day stay period under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure. <br><br> Purchase Agreement, definition of "Sale Order". |

ii.    *Summary of KD Purchase Agreement*[5]

| KD Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L.R. 6004-1(b)(iv) <br><br> Purchase Price | Subject to the terms and conditions hereof, the Buyer shall provide consideration for the Purchased Assets in the amount of $2,500,000 plus or minus (as applicable) the Working Capital Amount <br><br> Purchase Agreement, § 3.01. |
| Del. Bankr. L.R. 6004- | Buyer will assume and pay to perform and discharge when |

---

[5] To the extent there is a conflict or discrepancy between this summary and the KD Purchase Agreement, the KD Purchase Agreement shall govern in all respects. Capitalized terms used in the summary have the meanings ascribed to them in the KD Purchase Agreement. All references to "Purchase Agreement §" refer to sections of the KD Purchase Agreement.

| KD Purchase Agreement Provision | Summary Description |
|---|---|
| 1(b)(iv)<br><br>Material Term:<br>Assumed Liabilities | due the following Liabilities of the Sellers, in each case other than the Excluded Liabilities: (i) all Liabilities of any type attributable to or arising on or after Closing Date from Buyer's ownership and use of the Purchased Assets and the Assumed Contracts, (ii) the Cure Amounts with respect to each Assumed Contract, and (iii) the Accounts Payable.<br><br>Purchase Agreement, § 8.04. |
| Del. Bankr. L.R. 6004-1(b)(iv)(A)<br><br>Sale to Insider | The Stalking Horse Bidder is not an insider within the meaning of section 101(31) of the Bankruptcy Code.  As noted, the KD Stalking Horse Bidder's Chief Executive Officer served on the Board of Directors of the Debtors before the Debtors' acceptance of the KD Stalking Horse Bid. |
| Del. Bankr. L.R. 6004-1(b)(iv)(B)<br><br>Agreements with Management | None.  As noted, the KD Stalking Horse Bidder is a joint venture by which K.D. Pharma Bexbach GmbH is the majority investor with a minority investment being made by both John Licari and Anthony Valetutti, current employees of the Debtors and managers relating to the Ocean Blue Line.  . |
| Del. Bankr. L.R. 6004-1(b)(iv)(C)<br><br>Releases | None at this time |
| Del. Bankr. L.R. 6004-1(b)(iv)(D)<br><br>Private Sale / No Competitive Bidding | Not applicable |
| Del. Bankr. L.R. 6004-1(b)(iv)(E)<br><br>Closing and Other Deadlines | Among other events of termination, the Purchase Agreement may be terminated:<br><br>• if the Bidding Procedures Order is not entered by the Bankruptcy Court on or by June 29, 2018; and<br><br>• by either the Buyer or the Sellers, if the Closing has not occurred on or prior to August 15, 2018, for any reason other than the breach of any provision of this Agreement by the Party terminating this Agreement.<br><br>Purchase Agreement, § 10.01. |
| Del. Bankr. L.R. 6004- | The Stalking Horse Bidder has provided a good faith deposit |

| KD Purchase Agreement Provision | Summary Description |
|---|---|
| 1(b)(iv)(F)<br><br>Good Faith Deposit | in the amount of $100,000.<br><br>Purchase Agreement, § 3.01(a). |
| Del. Bankr. L.R. 6004-1(b)(iv)(G)<br><br>Interim Arrangements with Proposed Buyer | To the extent the Ocean Blue Line assets are intermingled with other of the Assets, the Debtors shall isolate such portion of Ocean Blue Line assets and deliver same to the KD Stalking Horse Bidder at Closing or as otherwise agreed by the Parties under the Transition Services Agreement<br><br>Purchase Agreement, § 2.01(a). |
| Del. Bankr. L.R. 6004-1(b)(iv)(H)<br><br>Use of Proceeds | The cash proceeds of the Sale, with any liens, claims, interests and encumbrances to attach to such proceeds to same extent, validity and priority as existed prior to the Petition Date, subject to the Carve Outs, will be paid to any creditors in accordance with the priorities of their allowed claims, upon further authorization from this Court as may be necessary or appropriate. |
| Del. Bankr. L.R. 6004-1(b)(iv)(I)<br><br>Tax Exemption | None. |
| Del. Bankr. L.R. 6004-1(b)(iv)(J)<br><br>Record Retention | With the exception of the books and records included in the definition of Excluded Assets below, all books, records and accounts, correspondence, production records, technical, accounting, manufacturing and procedural manuals, customer lists, vendor lists, employment records, research material, drawings, studies, reports or summaries of any operation, present or former, and any information (including Confidential Information) which has been reduced to writing (including digital media) solely relating to the Purchased Assets, whether by the Sellers or otherwise<br><br>Purchase Agreement, § 2.01(a)(x). |
| Del. Bankr. L.R. 6004-1(b)(iv)(K)<br><br>Sale of Avoidance Actions | All Chapter 5 Actions and Claims solely relating to the Business are transferred to the Buyer.<br><br>Purchase Agreement, § 2.01(a)(ix). |
| Del. Bankr. L.R. 6004- | The KD Purchase Agreement provides for the Sale Order to |

| KD Purchase Agreement Provision | Summary Description |
|---|---|
| 1(b)(iv)(L)<br><br>Successor Liability Findings | find and conclude that the sale is free and clear of Encumbrances, including claims for successor liability under any theory of Law or equity.<br><br>Purchase Agreement, § 2.01(a). |
| Del. Bankr. L.R. 6004-1(b)(iv)(M)<br><br>Free-and-Clear Sale of Unexpired Leases | None. |
| Del. Bankr. L.R. 6004-1(b)(iv)(N)<br><br>Credit Bid | None, except that the KD Stalking Horse Bidder is permitted to "credit bid" its Termination Payment in any competitive bidding at the Auction.<br><br>Purchase Agreement, § 11.01. |
| Del. Bankr. L.R. 6004-1(b)(iv)(O)<br><br>Rule 6004(h) Relief | The KD Purchase Agreement provides that the Sale Order find and conclude that relief from the stay imposed by Bankruptcy Rule 6004(h) is appropriate.<br><br>Purchase Agreement, § 11.05(iv). |

## Basis for Relief Requested

### A.    The Sale and the Bid Procedures Should Be Approved Based on the Sound Business Purpose Test.

23.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010), *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir.

1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Decora Indus., Inc.*, 2002 WL 32332749, at \*2 (D. Del. 2002); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

24.    In determining the propriety of the sale of assets by a chapter 11 debtor prior to confirmation of a plan of reorganization, the Second and Sixth Circuits, as well as other courts, have applied, among other factors required by section 363 of the Bankruptcy Code, a "sound business purpose" test. *See Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070-71; *see also Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991). In *In re Solar Mfg. Corp.*, the Third Circuit, pursuant to section 116(3) of the Bankruptcy Act of 1938 (the predecessor to section 363 of the Bankruptcy Code), applied the stricter standards of "emergency" or "perishability" on a proposed pre-confirmation sale of a chapter 11 debtor's assets. 176 F.2d 493, 494-95 (3d Cir. 1949). Although the Third Circuit has not specifically addressed the application of the "sound business purpose" test, in *In re Abbots Dairies of Pa., Inc.*, 788 F.2d 143, 143 (3d Cir. 1986), where the Third Circuit examined a pre-confirmation sale of assets of chapter 11 debtors, the Court did not mention the *Solar* decision, leading "other courts to [ ] conclu[de] that the Third Circuit follows the 'sound business purpose' test rather than the 'emergency' rule". *See In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Penn. 1991).

25.    The "sound business purpose" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely,

(a) that a sound business reason justifies the sale of assets outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith exists with respect to the purchaser of the assets. *Id.*; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984); *see also In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *In re Lionel*, 722 F.2d at 1071; *In re Montgomery Ward Holding Corp.*, 242 B.R. at 155. The Debtors submit that the decision to proceed with the approval of the Bid Procedures related to a potential sale is based upon their sound business judgment and should be approved.

26.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *Matter of Fesco Plastics Corp., Inc.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section

105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R 531, 537 (Bankr. W.D. Tenn. 1986) (noting that "the Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

27.      The Debtors submit that sound business justification exists to sell the Assets to the Successful Bidder pursuant to the Bid Procedures.  The Debtors believe the Stalking Horse Bids provide for a fair and reasonable consideration for the Assets.  Critically, the Stalking Horse Bids are subject to higher and better bids through the Bid Procedures.  The Debtors, with the assistance of their advisors, will conduct a thorough marketing process, which will determine the value of the Assets and the highest and best bid.  Moreover, as more fully set forth in the First Day Declaration, marketing the Assets and conducting an Auction and Sale is a requirement of the DIP Facility and the willingness of the DIP Lenders to provide post-petition financing and of the Prepetition Secured Parties consent to the use of Cash Collateral.  Thus, the relief request is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

28.      The Debtors also believe that the proposed Bid Procedures are reasonably designed to enable the Debtors to generate the highest value for the Assets.  The proposed Bid Procedures present a controlled, fair and open process that the Debtors believe will encourage bidding only from seriously interested parties who possess the financial and operational capacity to purchase the Assets.  As such, the Bid Procedures promote the primary goal of maximizing the value received by the estates.   Courts generally approve procedures that are intended to

encourage competitive bidding and are consistent with the goal of maximizing the value received by the estates.  *See In re John Joseph Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bidding procedures should facilitate an "open and fair" sale and be "designed to maximize value for the estate").

29.     The Debtors submit that the implementation of the Bid Procedures, if approved, will satisfy the prongs of the "sound business purpose" test.  For purposes of prong one, the Debtors seek to sell the Assets in order to garner value for the benefit of their estates.  The second prong of the "sound business purpose" test will be satisfied because the proposed Notice Procedures are designed to provide adequate notice to all potentially interested parties, including those who previously expressed an interest in purchasing the Assets.  With respect to the third prong, the Debtors intend to continue to market the Assets, to solicit interested bidders and to conduct the Auction in a manner aimed at yielding an adequate price for the Assets.  Finally, the Bid Procedures incorporate a good faith requirement of all Qualified Bidders applicable at both the commencement and conclusion of the Auction.

30.     For all of these reasons, the proposed Bid Procedures are reasonable, appropriate and within the Debtors' sound business judgment.  They provide the Debtors with the best method for obtaining the maximum realizable value for the Assets.  Thus, the Bid Procedures should be approved.

>    **B.      The Relief Sought in the Bidding Procedures Order Is in the
>             Best Interests of the Debtor's Estate and Should Be Approved.**

31.     The Debtors also seek authority to offer customary bid protections. The Debtors have agreed to pay each Break-Up Fee and Expense Reimbursement to the applicable Stalking Horse Bidder as an allowed administrative-expense priority claim (collectively, the "**Bid Protections**"), if such Stalking Horse Bidder is not a Successful Bidder and the Debtors close a

sale of the assets under the respective Purchase Agreement to another bidder or in the case of

certain breaches by the Debtors of the MidCap Purchase Agreement. The use of a stalking horse

in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a

customary practice in Chapter 11 cases, as the use of a stalking-horse bid is, in many

circumstances, the best way to maximize value in an auction process by "establish[ing] a

framework for competitive bidding and facilitat[ing] a realization of that value." *Official

Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219,

*1 (E.D. Wis . July 7, 2011). As a result, stalking horse bidders virtually always require break-up

fees and, in many cases, other forms of bidding protections as an inducement for "setting the

floor at auction, exposing its bid to competing bidders, and providing other bidders with access

to the due diligence necessary to enter into an asset purchase agreement." *Id.* (internal citations

omitted). Thus, the use of bidding protections has become an established practice in chapter 11

cases.

32.     Indeed, break-up fees and other forms of bidding protections are a normal and, in

many cases, a necessary component of significant sales conducted under section 363 of the

Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the

value of the debtor's assets…. In fact, because the … corporation has a duty to encourage

bidding, break-up fees can be necessary to discharge [such] duties to maximize value." *In re

Integrated Resources, Inc.*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992) (emphasis added).

Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder

to enter the bidding by providing some form of compensation for the risks it is undertaking." *In

re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted);

*see also Integrated Resources*, 147 B.R. at 660-61 (bid protections can prompt bidders to

commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's ... due diligence."). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O 'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

33.     The Debtors believe that the allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Bids will establish a floor for further bidding that may increase the consideration given for the Assets. Here, the Bid Protections are a critical component of the Stalking Horse Bidders' commitment. The Stalking Horse Bidders have expended time and resources negotiating, drafting, and performing due diligence activities, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested Break-Up Fees in good faith and at arm's-length with significant give-and-take with respect to proposed Bid Protections. As a result, by agreeing to the Bid Protections, the Debtors ensured that their estates would have the benefit of the transactions with the Stalking Horse Bidders without sacrificing the potential for interested parties to submit overbids at the Auction.

34.     If the Court does not approve the Bid Protections, the Stalking Horse Bidders may elect not to serve as the stalking horse with respect to the Assets under their respective Purchase Agreement, to the detriment of the Debtors' estates.  Further, if the Bid Protections were to be paid, it will likely be because the Debtor received higher or otherwise superior offers for the Assets. In short, the proposed Bid Protections are fair and reasonable under the circumstances

because the Break-Up Fee constitutes a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662 (quoting *995 Fifth Ave.*, 96 B.R. at 28). Accordingly, the Bid Protections should be approved.

### C. The Cure Procedures in Connection with the Potential Assumption and Assignment of Assigned Contracts are Reasonable and Appropriate.

35.    The Debtors believe that the proposed Cure Procedures in connection with the potential assumption and assignment of an Assigned Contract are appropriate and reasonably calculated to provide all non-Debtor parties to the Assigned Contracts with timely and proper notice of the Debtors' intent to assume and assign the Assigned Contracts.  The Cure Procedures provide the non-Debtor counterparties with an opportunity to challenge the assumption and assignment of such Assigned Contracts either as to the proposed Cure Amount or as to the assumption and assignment, in general.  Therefore, the Debtors respectfully request the Court approve the proposed Cure Procedures.

### D. The Notice Procedures are Reasonable and Appropriate.

36.    The Debtors believe that the proposed Notice Procedures are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Bid Procedures to be employed in connection therewith and the Sale Hearing

37.    The Debtors further believe that the Notice of Assumption and Assignment is reasonably calculated to provide all counterparties to the Assigned Contracts with proper notice of the potential assumption and assignment of the applicable Assigned Contract and any Cure Amount relating thereto.

38.     The Debtors submit that the proposed Notice Procedures comply with Bankruptcy Rule 2002 and Local Rule 2002-1.  Therefore, the Debtors believe that the Notice Procedures are reasonable, appropriate and should be approved.

> **E.      The Sale of the Assets Free and Clear of Liens and Other**
> **Interests Is Authorized by Section 363(f) of the Bankruptcy Code.**

39.     The Debtors further submit that it is appropriate to sell the Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the cash proceeds of the Assets to the extent applicable.   Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interests;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in

the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

41.     One or more of the subsections of section 363(f) are satisfied with respect to the transfer of the Assets pursuant to the Purchase Agreements.  In particular, the Debtors believe that at least sections 363(f)(2) will be met in connection with the transactions proposed under the Purchase Agreements because each of the parties holding liens on the Assets will consent or, absent any objection to this motion, will be deemed to have consented to the Sale. Any lienholder also will be adequately protected by having their liens, if any, in each instance against the Debtors or their estate, attach to the sale proceeds ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  To the extent that any parties in interest holding liens against the Assets do not consent to the Sale, the Debtors will seek approval of the Sale of the Assets free and clear of any liens, claims, interests and encumbrances in accordance with any other applicable provisions of section 363(f) of the Bankruptcy Code, including sections 363(f)(3) and 363(f)(5).

42.     Based upon the evidence presented and argument to be made at the Sale Hearing, the Debtors will seek entry of an order authorizing the sale of the Assets free and clear of any liens, claims, interests and encumbrances.

F.     **Assumption and Assignment of Certain Executory Contracts and Unexpired Leases.**

43.     Section 365(a) of the Bankruptcy Code provides that, subject to court approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor in possession has exercised its sound business

judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

44.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

45.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes,* Inc*.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

46.    At the Sale Hearing, the Debtors and the Successful Bidder will present evidence regarding the ability of the Successful Bidder to perform the Assigned Contracts.  Further, any non-Debtor parties to the Assigned Contracts will have the opportunity to evaluate the showing of adequate assurance by the Successful Bidder.  In addition, the Successful Buyer will be obligated to pay any cure costs due and owing to the non-Debtor parties to the Assigned

Contracts.  Therefore, based on the evidence presented and arguments made as the Sale Hearing, the Debtors will seek approval to assume and assign the Assigned Contracts to the Successful Bidder.

**G.    The Successful Bidder Should Be Entitled to the Protections of a Good Faith Purchaser Under Section 363(m).**

47.    Section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

48.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Assets.

49.    The selection of the Successful Bidder will be the product of arm's length, good faith negotiations between the Debtors and the various bidders and other parties in interest.  As such, the Debtors intend to request a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.  A finding of this nature will protect the Successful Bidder in the event of an appeal, thereby making the sale process more attractive to prospective bidders.

**H.    A Waiver of the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

50.    In order to facilitate the prompt disposition of the Assets, a waiver of the provisions of Bankruptcy Rules 6004(h) and 6006(d) is appropriate.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly,

Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

51.    The waiver of these provisions will result in a more rapid closing of the Sale, thereby providing greater certainty to prospective Bidders and lessening the expense of the Sale process.  Accordingly, a waiver of these provisions is appropriate.

### Consent to Jurisdiction

52.    Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

### Notice

53.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware; (b) the DIP Agent and the DIP Lenders; (c) the Prepetition Secured Parties; (d) creditors holding the twenty (20) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (e) those parties requesting notice pursuant to Bankruptcy Rule 2002; (f) the Office of the United States Attorney General for the District of Delaware; (g) the Internal Revenue Service; (h) the non-Debtor parties to the Assigned Contracts; (i) all taxing authorities in the states where the Debtors are located, including the Internal Revenue Service, and all other federal, state and local taxing and regulatory authorities known to the Debtors to assert jurisdiction over the Debtors or which are reasonably expected by the Debtors to have claims,

contingent or otherwise, in connection with the ownership of the Assets, or to have any known interest in the relief requested; (j) all persons known or reasonably believed by the Debtors to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any of the Assets; (k) all persons known or reasonably believed to have expressed an interest in acquiring the Assets within the last four (4) months; (*l*) Attorneys General in the states where the Debtors are located; and (m) all parties to any litigation involving the Debtors.

### No Prior Request

54.     No previous application for the relief sought herein has been made to this or any other court.

### Conclusion

55.     WHEREFORE, the Debtors respectfully request that this Court enter an order granting the relief requested herein and granting such other and further relief as is just and proper.

Dated:  June 6, 2018

GREENBERG TRAURIG, LLP

*/s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: melorod@gtlaw.com

-and-

Paul J. Keenan Jr. (*pro hac vice* pending)
John R. Dodd (*pro hac vice* pending)
Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: bloomm@gtlaw.com

keenanp@gtlaw.com
doddj@gtlaw.com
newmanar@gtlaw.com

*Proposed Counsel for the Debtors
and Debtors-in-Possession*